## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DEBORAH BAKER, GRANT MCNIFF, and DOROTHY MCNIFF,** on behalf of themselves and all others similarly situated,<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; THE BANK OF TOKYO MITSUBISHI UFJ LTD.; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS GROUP; BNP PARIBAS NORTH AMERICA, INC.; BNP PARIBAS SECURITIES CORP.; BNP PARIBAS PRIME BROKERAGE, INC.; CITIGROUP INC.; CITIBANK, N.A.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE GROUP AG; CREDIT SUISSE AG; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO.; HSBC HOLDINGS PLC; HSBC BANK PLC; HSBC NORTH AMERICA HOLDINGS, INC.; HSBC BANK USA, N.A.; HSBC SECURITIES (USA) INC.; JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; MORGAN STANLEY; MORGAN STANLEY & CO., LLC; MORGAN STANLEY & CO. INTERNATIONAL PLC; RBC CAPITAL MARKETS LLC; ROYAL BANK OF SCOTLAND GROUP PLC; RBS SECURITIES INC.; SOCIÉTÉ GÉNÉRALE S.A.; STANDARD CHARTERED BANK; UBS AG; UBS GROUP AG; and UBS SECURITIES LLC;**<br><br>**Defendants.** | Civil Action No. ___16-cv-07512___<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION, VENUE, AND INTERSTATE COMMERCE ..................................... 3

PARTIES ............................................................................................................................. 4

    I.       Plaintiffs ................................................................................................................. 4

    II.     Defendants ............................................................................................................. 5

CLASS ACTION ALLEGATIONS ................................................................................. 12

FACTUAL ALLEGATIONS ........................................................................................... 19

    I.       OVERVIEW OF THE FX MARKET .................................................................. 19

         A.      Background .................................................................................................. 19

         B.      Benchmark Rates ........................................................................................ 25

              1.      WM/Reuters ................................................................................... 26

              2.      The ECB Rates ............................................................................... 27

         C.      The FX Market Is Concentrated and Dominated by Defendants .............. 27

         D.      The FX Market Is Susceptible to Collusion ............................................. 29

    II.     DEFENDANTS CONSPIRED TO FIX FX PRICES ........................................... 30

         A.      Defendants Conspired to Fix Prices and Carried Out the Conspiracy through Electronic Communications ........................................................ 31

         B.      Defendants Conspired to Fix Bid/Ask Spreads ........................................ 39

         C.      Defendants' Conspiracy to Fix the Benchmark Rates .............................. 40

              1.      Defendants Shared Proprietary Trade Data In Order To Manipulate FX Benchmark Rates ..................................................................... 40

              2.      Methods of Manipulating Benchmark Rates ................................. 41

         D.      Other Conduct in Furtherance of the Conspiracy ..................................... 47

    III.    DEFENDANTS' CONSPIRACY IMPACTED OTHER FX INSTRUMENTS ... 47

    IV.    GOVERNMENT INVESTIGATIONS OF DEFENDANTS FOR ILLEGAL CONDUCT IN FX TRADING ............................................................................ 48

    V.     DIRECT PURCHASER LITIGATION AND SETTLEMENTS .......................... 55

    VI.    DEFENDANTS TERMINATED AND SUSPENDED TRADERS, FORCED TRADERS TO RESIGN, AND IMPLEMENTED INTERNAL SAFEGUARDS AFTER THE CLASS PERIOD ................................................................................ 57

ANTITRUST INJURY TO PLAINTIFFS ...................................................................... 60

FRAUDULENT CONCEALMENT ............................................................................... 64

CLAIMS FOR RELIEF ................................................................................................... 65

REQUESTS FOR RELIEF ................................................................................................... 73

DEMAND FOR JURY TRIAL ........................................................................................... 74

Plaintiffs Deborah Baker, Grant McNiff, and Dorothy McNiff, on behalf of themselves and the proposed Classes (defined below), make these allegations against Defendants based upon personal knowledge as to matters relating to themselves, and upon information and belief, documents produced in discovery in related litigation and government investigations, and the investigations of counsel as to all other matters.

## NATURE OF THE ACTION

1.      This case involves a conspiracy among horizontal competitors to fix the prices of foreign currencies ("FX") and foreign currency instruments.  Plaintiffs bring this action for equitable and injunctive relief on behalf of a proposed Nationwide Classes, and to recover for injuries caused by Defendants on behalf of the proposed State Classes.[1]

2.      The FX market is highly concentrated, and a significant majority of all FX transactions placed during the Class Period (defined below) were carried out by Defendants.  Plaintiffs and members of the Classes are indirect purchasers of FX Instruments[2] from Defendants and/or their co-conspirators.

3.      Beginning at least as early as 2007 and continuing through at least 2013, Defendants conspired with each other to fix prices in the FX market.  Defendants communicated with each other daily, exchanging confidential customer information and coordinating their trading strategies to manipulate FX benchmark rates and fix FX prices.  These collusive

---

[1] *See* Class definitions, *infra* at "Class Action Allegations."

[2] "FX Instrument" is defined as any FX spot transaction, forward, swap, future, option, or any other FX transaction or instrument the trading or settlement value of which is related in any way to any FX Benchmark Rate, including FX Exchange-Traded Instruments.  "FX Benchmark Rates" include (i) the WM/Reuters fixing rates, including the 4:00 p.m. London time closing spot rate; (ii) the European Central Bank ("ECB") FX reference rates, including the ECB rate set at 1:15 p.m. London time; (iii) the Chicago Mercantile Exchange ("CME") daily settlement rates, including the rate set at 2:00 p.m. Central Time; and (iv) any other FX benchmark, fixing, or reference rate.  An "FX Exchange-Traded Instrument" is defined as any FX Instrument that was listed for trading through a U.S. exchange, including, but not limited to, FX futures contracts and options contracts.

communications were widespread throughout Defendants' FX trading departments.  As one FX trader at Defendant Barclays wrote, "if you aint cheating, you aint trying."

4.      Due to the importance of FX benchmark rates, Defendants' conspiracy impacted all forms of FX Instruments, including spot transactions, futures, and options.

5.      Defendants' conspiracy has been the subject of investigations by multiple U.S., foreign, and international governmental authorities, as well as a nationwide direct purchaser class action currently pending in this District before Judge Schofield, brought on behalf of persons and entities that purchased FX Instruments directly from one or more Defendants or co-conspirators, and persons and entities that purchased FX Exchange-Traded instruments directly on a U.S. exchange.

6.      Several government authorities have imposed fines and other sanctions on one or more Defendants, including the U.S. Department of Justice, U.S. Commodity Futures Trading Commission, U.S. Federal Reserve, New York State Department of Financial Services, United Kingdom Financial Conduct Authority, and the Swiss Financial Market Supervisory Authority. Thus far, Defendants have paid over $11 billion in fines and settlements to government authorities for their involvement in the FX market manipulation conspiracy.

7.      On October 22, 2015, the direct purchaser class plaintiffs in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 1:13-cv-07789-LGS (S.D.N.Y.) ("*FX Direct Purchaser Litigation*") moved for preliminary approval of settlements totaling $2,009,075,000 with the following Defendants: Bank of America Corporation; Bank of America, N.A.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Barclays Bank PLC; Barclays Capital Inc.; BNP Paribas Group; BNP Paribas North America Inc.; BNP Paribas Securities Corp.; BNP Prime Brokerage, Inc.; Citigroup Inc.; Citibank, N.A.; Citicorp; Citigroup Global Markets Inc.; The Goldman

Sachs Group, Inc.; Goldman, Sachs & Co.; HSBC Holdings PLC; HSBC Bank PLC; HSBC North America Holdings Inc.; HSBC Bank USA, N.A.; HSBC Securities (USA) Inc.; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; The Royal Bank of Scotland Group PLC; The Royal Bank of Scotland PLC; RBS Securities Inc.; UBS AG; UBS Group AG; and UBS Securities LLC (collectively, the "Settling Defendants"). *See* ECF No. 480. On December 15, 2015, Judge Schofield preliminarily approved the settlements, designated a settlement administrator, and preliminarily certified the proposed direct purchaser settlement classes. *Id.* at ECF No. 536. The *FX Direct Purchaser Litigation* is ongoing against the remaining Defendants: Bank of Tokyo-Mitsubishi UFJ Ltd.; Credit Suisse Group AG; Credit Suisse AG; Credit Suisse Securities (USA) LLC; Deutsche Bank AG; Deutsche Bank Securities Inc.; Morgan Stanley; Morgan Stanley & Co., LLC; Morgan Stanley & Co. International plc; RBC Capital Markets, LLC; Société Générale S.A.; and Standard Chartered Bank (collectively, the "Non-Settling Defendants"). The Defendants currently named in *FX Direct Purchaser Litigation* (including Settling Defendants and Non-Settling Defendants) are identical to the Defendants named in this Complaint.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

8.     This Court has subject matter jurisdiction under the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26, the Sherman Act, 15 U.S.C. § 1, and 28 U.S.C. §§ 1331 and 1337(a). This Court also has subject matter jurisdiction for the state-law claims under 28 U.S.C. § 1332(d) and 1367(a), in that: (a) this is a class action in which the aggregate amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants; and (b) Plaintiffs' state-law claims form all or part of the same case or controversy as their federal claims under Article III of the United States Constitution.

9.      The Court has personal jurisdiction over each Defendant because Defendants' collusive and manipulative acts took place, in substantial part, in New York specifically and in the United States generally.  These acts were conducted by persons and entities subject to the laws of the United States, as well as New York, California, and other states.  Each Defendant has continuously and systematically transacted FX in this District and throughout the United States. Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District and throughout the United States. Defendants' conduct was within the flow of, and had a substantial effect on, the interstate commerce of the United States, including in this District.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 22.  All Defendants reside, transact business, are found, or have agents in this District. Additionally, a substantial part of the events giving rise to Plaintiffs' claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

### I.    Plaintiffs

11.      Plaintiff Deborah Baker is an individual and a resident of Erie County, New York. During the Class Period defined below, Plaintiff Deborah Baker purchased and owned shares of exchange-traded funds ("ETFs") that entered into FX Instruments directly with one or more Defendants.  As a result of Defendants' illegal conduct described herein, those ETFs paid one or more Defendants artificially inflated prices for FX Instruments, thereby injuring Plaintiff Deborah Baker in the form of overcharge on the FX Instruments.  Thus, Plaintiff Deborah Baker indirectly purchased FX Instruments from one or more Defendants during the Class Period and

4

was injured as a result of Defendants' anticompetitive conduct alleged herein.  Plaintiff Deborah

Baker is referred to herein as the "New York Plaintiff."

12.     Plaintiffs Grant McNiff and Dorothy McNiff are individuals and residents of

Orange County, California.  During the Class Period defined below, Plaintiffs Grant McNiff and

Dorothy McNiff purchased and owned shares of ETFs that entered into FX Instruments directly

with one or more Defendants.  As a result of Defendants' illegal conduct described herein, those

ETFs paid one or more Defendants artificially inflated prices for FX Instruments, thereby

injuring Plaintiffs Grant McNiff and Dorothy McNiff in the form of overcharge on the FX

Instruments.  Thus, Plaintiffs Grant McNiff and Dorothy McNiff indirectly purchased FX

Instruments from one or more Defendants during the Class Period and were injured as a result of

Defendants' anticompetitive conduct alleged herein.  Plaintiffs Grant McNiff and Dorothy

McNiff are referred to herein as the "California Plaintiffs."

## II.     Defendants

13.     **Bank of America:** Defendant Bank of America Corporation is a Delaware

corporation headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255.  Bank of

America Corporation is a multi-national banking and financial services corporation, with its

investment banking division located at the Bank of America Tower, One Bryant Park, 1111

Avenue of the Americas, New York, New York 10036.  Defendant Bank of America, N.A. is a

federally-charted national banking association headquartered at 101 South Tyron Street,

Charlotte, North Carolina 28255, and is an indirect, wholly-owned subsidiary of Bank of

America Corporation.  Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a Delaware

corporation with its headquarters at One Bryant Park, New York, New York 10036, and is a

wholly-owned subsidiary of Bank of America Corporation.  Defendants Bank of America

5

Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Inc. are referred to collectively in this Complaint as "Bank of America."

14.     **Bank of Tokyo-Mitsubishi:** Defendant The Bank of Tokyo Mitsubishi UFJ Ltd. ("BTMU") is a Japanese company headquartered in Tokyo, Japan.  BTMU's New York Branch is BTMU's "traditional hub" for FX trading, and is headquartered at 1251 Avenue of the Americas, New York, New York 10002.  The New York Department of Financial Services ("NYDFS") lists BTMU as a foreign bank licensed to do business in New York through the BTMU New York Branch.  At year-end 2013, BTMU reported for its New York branch gross notional outstanding spot FX contracts of $2.4 billion and FX derivatives of $69.8 billion, for a total of $72.2 billion. *See FX Direct Purchaser Litigation*, 2016 WL 1268267, at *6 (S.D.N.Y. Mar. 31, 2016) (denying BTMU's motion to dismiss the FX direct purchaser complaint against BTMU for lack of personal jurisdiction).

15.     **Barclays:** Defendant Barclays Bank PLC is a British public limited company headquartered in London, England.  Barclays Bank PLC is licensed by the NYDFS with a registered address at 745 Seventh Avenue, New York, New York 10019.  Defendant Barclays Capital Inc. is a wholly-owned subsidiary of Barclays Bank PLC and engages in investment banking, wealth management, and investment management services.  Barclays Capital Inc. is headquartered at 745 7th Avenue New York, NY 10019.  Defendants Barclays Bank PLC and Barclays Capital Inc. are referred to collectively in this Complaint as "Barclays."

16.     **BNP Paribas:** Defendant BNP Paribas Group is a French bank and financial services company headquartered in Paris, France.  BNP Paribas Group is licensed by the New York Department of Financial Services with a registered address at 787 Seventh Avenue, New York, New York 10019.  BNP Paribas North America, Inc. is a Delaware corporation

headquartered at 787 Seventh Avenue, New York, New York 10019.  BNP Paribas North America, Inc. provides corporate, investment banking, and securities brokerage activities and is an affiliate of BNP Paribas Group.  Defendant BNP Paribas Securities Corp. is a Delaware corporation with its principal place of business in New York, New York.  BNP Paribas Securities Corp. is a wholly-owned subsidiary of BNP Paribas North America, Inc.  BNP Paribas Prime Brokerage, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Defendants BNP Paribas Group, BNP Paribas North America, Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc. are referred to collectively in this Complaint as "BNP Paribas."

17.     **Citigroup:** Defendant Citigroup Inc. is a Delaware corporation headquartered at 399 Park Avenue, New York, New York 10022.  Defendant Citibank, N.A. ("Citibank") is a federally chartered national banking association headquartered at 399 Park Avenue, New York, New York 10022 and is a wholly-owned subsidiary of Defendant Citigroup Inc.  Defendant Citicorp is a financial services holding company organized and existing under the laws of Delaware.  Defendant Citigroup Global Markets Inc. is a wholly-owned subsidiary of Citigroup, organized and existing under the laws of New York, headquartered at 390 Greenwich Street, New York, New York 10013.  Defendants Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc. are referred to collectively in this Complaint as "Citigroup."

18.     **Credit Suisse:** Defendant Credit Suisse Group AG is a Swiss holding company headquartered in Zurich, Switzerland.  Defendant Credit Suisse AG is a wholly-owned subsidiary of Credit Suisse Group AG and is a bank organized under the laws of Switzerland, with its principal place of business located in Zurich, Switzerland.  Credit Suisse AG is licensed by the NYDFS and operates a foreign branch with a registered address at 11 Madison Avenue,

New York, NY 10010.  Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company headquartered at 11 Madison Avenue, New York, New York 10010, and is a wholly-owned subsidiary of Credit Suisse Group AG.  Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC are referred to collectively in this Complaint as "Credit Suisse."

19.    **Deutsche Bank:** Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany.  Defendant Deutsche Bank AG is licensed by the NYDFS with a registered address at 60 Wall Street, 4th Floor, New York, New York 10005.  Defendant Deutsche Bank Securities Inc. is a Delaware corporation with its principal place of business at 60 Wall Street, New York, New York, 10005.  Deutsche Bank Securities Inc. is an indirect wholly-owned subsidiary of Deutsche Bank AG.  Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. are referred to collectively in this Complaint as "Deutsche Bank."

20.    **Goldman Sachs:** Defendant The Goldman Sachs Group, Inc. is a Delaware corporation headquartered at 200 West Street, New York, New York 10282.  The Goldman Sachs Group, Inc. is a bank holding company and a financial holding company.  Defendant Goldman, Sachs & Co. is a wholly-owned subsidiary of The Goldman Sachs Group, Inc. and is its principal operating subsidiary in the United States.  Goldman, Sachs & Co. is located at 200 West Street, New York, New York 10282.  Defendants The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. are referred to collectively in this Complaint as "Goldman Sachs."

21.    **HSBC:** Defendant HSBC Holdings PLC is a United Kingdom public limited company headquartered in London, England.  Defendant HSBC Bank PLC is a wholly-owned subsidiary of HSBC Holdings PLC, and is also a United Kingdom public limited company headquartered in London, England.  Defendant HSBC North America Holdings, Inc. is a

Delaware corporation headquartered at 452 5th Avenue, New York, New York 10018, and is a wholly-owned subsidiary of HSBC Holdings PLC.  Defendant HSBC North America Holdings, Inc. is the holding company for HSBC Holdings PLC's operations in the United States. Defendant HSBC Bank USA, N.A. is a national banking association with its principal place of business in New York, New York, and is an indirect wholly-owned subsidiary of HSBC North America Holdings, Inc.  Defendant HSBC Securities (USA) Inc. is a Delaware corporation with its principal place of business at 452 Fifth Avenue, New York, NY, United States.  Defendants HSBC Holdings PLC; HSBC Bank PLC; HSBC North America Holdings, Inc.; HSBC Bank USA, N.A.; and HSBC Securities (USA) Inc. are referred to collectively in this Complaint as "HSBC."

22.    **JPMorgan:** Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered at 270 Park Avenue, 38th Floor, New York, New York 10017.  Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association, also headquartered at 270 Park Avenue, 38th Floor, New York, New York 10017, and is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. are referred to collectively in this Complaint as "JPMorgan."

23.    **Morgan Stanley:** Defendant Morgan Stanley is a Delaware corporation headquartered at 1585 Broadway, New York, New York 10036.  Defendant Morgan Stanley & Co., LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York.  Morgan Stanley & Co., LLC is a wholly-owned subsidiary of Morgan Stanley.  Defendant Morgan Stanley & Co. International plc is a United Kingdom public limited company with headquarters in London, England.

Defendants Morgan Stanley; Morgan Stanley & Co., LLC; and Morgan Stanley & Co. International plc are referred to collectively in this Complaint as "Morgan Stanley."

24.    **RBC:** Defendant RBC Capital Markets LLC ("RBC") is a limited liability company incorporated in Minnesota, with its principal place of business and headquarters located at Three World Financial Center, 200 Vesey Street, 5th Floor, New York, New York 10281.  Prior to 2010, RBC was RBC Capital Markets Corporation, which was also a Minnesota corporation headquartered in New York, New York.

25.    **RBS:** Defendant Royal Bank of Scotland Group PLC is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  Defendant Royal Bank of Scotland Group PLC is licensed by the NYDFS with a registered address at 340 Madison Avenue, New York, New York 10173.  Defendant RBS Securities Inc. is a Delaware corporation headquartered at 600 Washington Boulevard, Stamford, Connecticut 06901.  Defendants Royal Bank of Scotland Group PLC and RBS Securities, Inc., are referred to collectively in this Complaint as "RBS."

26.    **Société Générale:** Defendant Société Générale S.A. ("Société Générale") is a financial services company headquartered in Paris, France.  Société Générale's New York Branch is headquartered at 1221 Avenue of the Americas, New York, New York 10020.  Société Générale is licensed by the NYDFS with a registered address of 245 Park Avenue, New York, New York 10167.  One of the Société Générale New York Branch's "primary activities" is the sale of FX Instruments, and its heads of emerging market FX trading and G10 FX trading are based in New York.  At year-end 2013, Société Générale reported for its New York branch gross notional outstanding spot FX contracts of approximately $13 million and FX derivatives of $21.6

billion.  *See id.* (denying Société Générale's motion to dismiss the FX direct purchaser complaint against Société Générale for lack of personal jurisdiction).

27.    **Standard Chartered:** Defendant Standard Chartered Bank ("Standard Chartered") is incorporated under the laws of England and Wales, with headquarters in London, England.  Standard Chartered is licensed by the NYDFS with a registered address at 1094 Avenue of the Americas, No. 37, New York, New York 10036.  Standard Chartered's New York Branch, located at 1095 Avenue of the Americas, New York, NY 10036, is the headquarters for Standard Chartered's "Americas" business and "primarily conducts a U.S. dollar clearing business," including the sale of FX Instruments.  At year-end 2013, Standard Chartered Bank reported for its New York branch gross notional outstanding spot FX contracts of $1.9 billion and FX derivatives of $141.4 billion.  *See id.* (granting motion to dismiss the FX direct purchaser complaint for lack of personal jurisdiction as to Standard Chartered Bank's parent company Standard Chartered plc, which does not conduct business in New York, but permitting an application to substitute Standard Chartered Bank as a defendant).

28.    **UBS:** Defendant UBS AG is a Swiss company based in Basel and Zurich, Switzerland, and is a wholly owned subsidiary of Defendant UBS Group AG.  Defendant UBS Group AG is a Swiss company headquartered in Zurich, Switzerland.  Defendant UBS Securities LLC is a Delaware limited liability company headquartered at 677 Washington Blvd, Stamford, Connecticut 06901, and is a wholly-owned subsidiary of UBS AG.  Defendants UBS AG, UBS Group AG, and UBS Securities LLC are referred to collectively in this Complaint as "UBS."

29.    "Defendant" or "Defendants," as used herein, includes all Defendants named specifically above, as well as all of the named Defendants' predecessors, direct or indirect

11

parents, subsidiaries, or divisions, including entities that merged with or were acquired by the named Defendants that played a material role in the unlawful acts alleged in this Complaint.

30.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

31.     Various other persons, firms, and corporations, that are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.  "Co-conspirators," as used herein, includes direct or indirect parents, subsidiaries, and divisions of all co-conspirator entities.

## CLASS ACTION ALLEGATIONS

32.     Plaintiffs bring this action individually and as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, on behalf of the following proposed nationwide indirect purchaser classes (the "Nationwide Classes"):

> **Nationwide OTC Class:** All persons and entities who, between December 1, 2007 and December 31, 2013 (inclusive) (the "Class Period"), indirectly purchased an FX Instrument[3] from a Defendant or co-conspirator in the United States and/or while domiciled in the United States, by: (a) entering into an FX Instrument with a member of the Direct Settlement Class,[4] where the Direct Settlement Class member entered into the

---

[3] *See supra* note 2.

[4] "Direct Settlement Class" refers to the class of direct purchasers who purchased an FX Instrument directly from one or more Defendants, which was granted preliminarily class certification for settlement purposes in *FX Direct Purchaser Litigation*, ECF No. 536 ("Preliminary Approval Order").  The Preliminary Approval Order defines the Direct Settlement Class as:

> All Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX Instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant,

FX Instrument directly with a Defendant or co-conspirator; (b) owning an interest in an FX Investment Vehicle[5] for which a member of the Direct Settlement Class entered into an FX Instrument directly with a Defendant or co-conspirator; and/or (c) owning an interest in an FX Account[6] for which a member of the Direct Settlement Class entered into an FX Instrument directly with a Defendant or co-conspirator.

**Nationwide Exchange Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Exchange-Traded Instrument[7] from a Defendant or co-conspirator in the United States and/or while domiciled in the United States, by: (a) entering into an FX Exchange-Traded Instrument with a member of the Exchange-Only Settlement Class,[8] where the Exchange-Only Settlement Class member entered into the

---

a Released Party, or coconspirator where such Persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted FX Instruments in the United States or its territories. Specifically excluded from the Direct Settlement Class are Defendants; Released Parties; co-conspirators; the officers, directors, or employees of any Defendant, Released Party, or co-conspirator; any entity in which any Defendant, Released Party, or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, Released Party, or co-conspirator and any person acting on their behalf; provided, however, that Investment Vehicles shall not be excluded from the definition of the Direct Settlement Class. Also excluded from the Direct Settlement Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this Action.

*See also infra* at Factual Allegations, Section V ("Direct Purchaser Litigation and Settlements"). Although the Direct Class Settlement and the Exchange-Only Class Settlement (collectively, the "Direct/Exchange-Only Settlements") were entered into only between the Direct Purchaser Class Plaintiffs and the "Settling Defendants," the Direct Settlement Class is defined to include all direct purchasers who entered into an FX instrument with *any* Defendant named in the *FX Direct Purchaser Litigation*, including the "Non-Settling Defendants." *See, e.g.*, *FX Direct Purchaser Litigation*, ECF No. 653-2 (Direct Purchaser Class Plaintiffs' Proposed Notice) (defining "Settling Defendants" and "Non-Settling Defendants" collectively as "Defendants"). The Defendants referred to in the Direct Settlement Class definition (including both the Settling Defendants and the Non-Settling Defendants) are identical to the Defendants named in this Complaint.

[5] An "FX Investment Vehicle" is any investment fund, including mutual funds, exchange-traded funds, retirement funds (excluding those governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3)), in which or for the benefit of which an FX Instrument was entered into.
[6] An "FX Account" is any cash, deposit, secured, segregated, or revolving account, including secured futures accounts subject to 17 C.F.R. § 30.7 ("Section 30.7 accounts"), in which or for the benefit of which an FX Instrument was entered into.
[7] *See supra* note 2.
[8] "Exchange-Only Settlement Class" refers to the class of direct purchasers who entered into entered into an FX Exchange-Traded Instrument directly on a U.S. exchange, which was granted preliminarily class certification for settlement purposes in the *FX Direct Purchaser Litigation* Preliminary Approval Order. The preliminary approval order defines the Exchange-Only Settlement Class as:

All Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into FX Exchange-Traded Instruments where such Persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, entered into FX Exchange-Traded Instruments on a U.S. exchange. Specifically excluded from the Exchange-Only Settlement Class are Defendants; Released Parties; co-conspirators; the officers, directors, or employees of any Defendant, Released Party, or co-conspirator; any entity in which any Defendant, Released Party, or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, Released Party, or co-conspirator and any person acting on their behalf; provided, however, that Investment Vehicles shall not be excluded from the definition of the Exchange-Only Settlement Class. Also excluded from the Exchange-

FX Exchange-Traded Instrument on a U.S. exchange; and/or (b) owning an interest in an FX Investment Vehicle for which a member of the Exchange-Only Settlement Class entered into an FX Exchange-Traded Instrument on a U.S. exchange.

33.     The California Plaintiffs also bring this action individually and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to California antitrust and consumer protection laws on behalf the following proposed California indirect purchaser classes or subclasses (the "California Classes"):

> **California OTC Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator in California and/or while domiciled in California, by: (a) entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator; (b) owning an interest in an FX Investment Vehicle for which a member of the Direct Settlement Class entered into an FX Instrument directly with a Defendant or co-conspirator; and/or (c) owning an interest in an FX Account for which a member of the Direct Settlement Class entered into an FX Instrument directly with a Defendant or co-conspirator.

> **California Exchange Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Exchange-Traded Instrument from a Defendant or co-conspirator in California and/or while domiciled in California, by: (a) entering into an FX Exchange-Traded Instrument with a member of the Exchange-Only Settlement Class, where the Exchange-Only Settlement Class member entered into the FX Exchange-Traded Instrument on a U.S. exchange; and/or (b) owning an interest in an FX Investment Vehicle for which a member of the Exchange-Only Settlement Class entered into an FX Exchange-Traded Instrument on a U.S. exchange.

34.     The New York Plaintiff also brings this action individually and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to New York antitrust law on behalf the following proposed New York indirect purchaser classes or subclasses (the "New York Classes"):

---

Only Settlement Class are: (i) any judicial officer presiding over this action and any member of his/her immediate family and judicial staff, and any juror assigned to this Action; and (ii) any Person who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX Instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant, a Released Party, or coconspirator, where such Person was either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted FX Instruments in the United States or its territories.

*See also infra* at Factual Allegations, Section V ("Direct Purchaser Litigation and Settlements").

**New York OTC Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator in New York and/or while domiciled in New York, by: (a) entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator; (b) owning an interest in an FX Investment Vehicle for which a member of the Direct Settlement Class entered into an FX Instrument directly with a Defendant or co-conspirator; and/or (c) owning an interest in an FX Account for which a member of the Direct Settlement Class entered into an FX Instrument directly with a Defendant or co-conspirator.

**New York Exchange Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Exchange-Traded Instrument from a Defendant or co-conspirator in New York and/or while domiciled in New York, by: (a) entering into an FX Exchange-Traded Instrument with a member of the Exchange-Only Settlement Class, where the Exchange-Only Settlement Class member entered into the FX Exchange-Traded Instrument on a U.S. exchange; and/or (b) owning an interest in an FX Investment Vehicle for which a member of the Exchange-Only Settlement Class entered into an FX Exchange-Traded Instrument on a U.S. exchange.

35.     The proposed California Classes and New York Classes are referred to collectively herein as the "State Classes."  The proposed Nationwide Classes and State Classes are referred to collectively herein as the "Classes."

36.     Excluded from the Classes are Defendants and their co-conspirators; the officers, directors, and employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator; federal, state, and municipal government entities and agencies; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; and any juror assigned to this action.

37.     Also excluded are all indirect purchases of FX Instruments and FX Exchange-Traded Instruments where both the direct purchaser and the Defendant or co-conspirator with whom the direct purchaser transacted were operating outside of the U.S. at the time the direct purchase was made.

38.     While Plaintiffs do not know the exact number of the members of the proposed Classes, Plaintiffs believe there are (at least) thousands of members in each Class.  The Classes are readily ascertainable from existing records of members of the Direct Settlement Class and the Exchange-Only Settlement Class (collectively, the "Direct/Exchange-Only Settlement Classes").

39.     Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and members of the Classes sustained damages arising out of Defendants' common course of conduct in violation of federal antitrust laws, state antitrust laws, and state consumer protection law.

40.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' and their co-conspirators' conspiracy, which was generally applicable to all members of the Classes, thereby making appropriate relief with respect to each Class as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

a.      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of FX Instruments sold in the United States;

b.      The identities of the participants of the alleged conspiracy;

c.      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated the Sherman Act, 15 U.S.C. § 1, as alleged in the First Claim for Relief;

e.      Whether the alleged conduct of Defendants and their co-conspirators caused injury to Plaintiffs and the members of the Classes;

        f.         The effects of the alleged conspiracy on the prices of FX Instruments sold in the United States during the Class Period;

        g.         Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

        h.         Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

        i.         The appropriate injunctive and related equitable relief for the Nationwide Classes;

        j.         For the California Classes, whether the alleged conspiracy violated California Business and Professions Code § 16720, *et seq.* (the Cartwright Act), as alleged in the Second Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations;

        k.         For the California Classes, whether the alleged conspiracy violated California Business and Professions Code § 17200, *et seq.* (California's Unfair Competition Law), as alleged in the Third Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations; and

        l.         For the New York Classes, whether the alleged conspiracy violated New York General Business Laws § 340, *et seq.* (the Donnelly Act), as alleged in the Fourth Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations.

        41.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes were similarly affected by Defendants' wrongful conduct in that they

were overcharged for FX Instruments purchased indirectly from Defendants and/or Defendants' co-conspirators.

42.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

43.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

44.     Class action treatment is the superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

45.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

**FACTUAL ALLEGATIONS**

I.      **OVERVIEW OF THE FX MARKET**

     A.      **Background**

     46.      The FX market is the global financial market in which currencies are traded.  It is the largest, most actively traded, and most liquid financial market in the world.  Global FX trading grew from an average of $1.9 trillion per day in April 2004 to $5.3 trillion per day in April 2013.  According to the Federal Reserve Bank of New York's 2013 Triennial Report on the Foreign Exchange and Interest Rate Derivatives Markets, this rapid growth in trading volume was due in large part to increased market participation by financial companies such as "hedge funds, pension funds, mutual funds, and insurance companies."

     47.      There are over 200 different currencies used around the world, each with a distinct three-letter currency code used by FX traders.  The ten most heavily traded currencies in the world—called the "Group of 10," or "G10" currencies—are the U.S. dollar (USD), the Canadian dollar (CAD), the euro (EUR), the British pound (GBP), the Swiss franc (CHF), the New Zealand dollar (NZD), the Australian dollar (AUD), the Japanese yen (JPY), the Norwegian krone (NOK), and the Swedish krona (SEK).

     48.      The market for facilitating and executing FX trades is highly concentrated.  A large majority of all FX trades are transacted by Defendants.  Other market participants include smaller dealer banks, central banks, smaller commercial banks, commercial companies that use FX (such as credit card companies), non-financial corporations, insurance companies, private individuals, and investment funds.

     49.      The FX traders employed by Defendants were part of a geographically and socially concentrated group.  They lived in close proximity, attended the same social gatherings, and communicated frequently.  The close social and professional ties among FX traders

facilitated and provided incentives for the conspiracy alleged herein.  As one former Citigroup

trader acknowledged, "[t]his is a market in which price fixing and collusion could actually

work."

50.     FX Investment Vehicles trade and hold FX Instruments for a variety of purposes.

Some investment vehicles seek to earn income on FX trades through investment strategies such

as short-term arbitrage, long-term strategic positioning, options trading, and volatility strategies.

Others hold FX as a means of diversifying their investment portfolios.  Many investment

vehicles that trade in foreign assets use FX trades to make foreign asset purchases and to convert

foreign revenues into U.S. dollars.  Foreign financial market investments generally are made in

the currency of the country where the market is located, so U.S. investment vehicles that invest

in foreign assets frequently place FX trades with dealers such as Defendants in order to convert

U.S. dollars into foreign currency and then purchase foreign assets with that foreign currency.

When the investment vehicle sells the foreign assets, the proceeds are denominated in foreign

currency, and the investment vehicle must place another FX trade to convert the proceeds into

U.S. dollars.  Some FX Investment Vehicles that trade in foreign assets hedge their investments

against risks of foreign currency fluctuations by purchasing and holding FX futures and options,

an investment strategy known as "currency hedging."

51.     FX trades may be conducted either over-the-counter ("OTC") directly with

another party, or on a centralized exchange.  During the Class Period, approximately 98 percent

of FX trading occurred OTC, and the large majority of those trades involved one or more

Defendants.  The remaining 2 percent of all FX trades during the Class Period were made on

U.S. exchanges.

52.     The OTC FX market is open and actively traded 24 hours a day during the week. The FX market opens Monday at 7 a.m. local time in New Zealand.  One hour later, Sydney opens, followed by Tokyo, Hong Kong, and Singapore.  Later, trading shifts to Europe, where the main financial centers are London, Frankfurt, Zürich, Geneva, Paris, and Milan.  New York and London (the two largest FX trading centers) are open simultaneously for four hours, between 8:00 a.m. and 12:00 p.m. U.S. Eastern Time ("ET"), which is between 1:00 p.m. and 5:00 p.m. London time.  The New York FX market is open from 8:00 a.m. ET to 5:00 p.m. ET, and London is open from 3:00 a.m. to 12:00 p.m. ET.

53.     FX market centers officially close at 5:00 p.m. local time, but the market does not close during the week because, except on Friday, the new trading day starts immediately in other cities.  With the advent of electronic trading, it is possible to place FX trades over the weekends.

54.     Like the OTC market, trading on centralized U.S. financial exchanges is available 24 hours a day.  The two most actively traded U.S. FX exchanges are the Chicago Mercantile Exchange ("CME") and the Intercontinental Exchange ("ICE").

55.     Currencies are bought or sold in "currency pairs" of two different currencies.  The price to buy or sell a given currency pair is reflected by its exchange rate.  For example, EUR/USD refers to the exchange rate for the purchase or sale of euros in exchange for U.S. dollars.  In April 2013, the four most-traded currency pairs were EUR/USD (24.1 percent of all net FX trade volume), USD/JPY (18.3 percent), GBP/USD (8.8 percent), and AUD/USD (6.8 percent).  Approximately 86.9 percent of daily FX trading in April 2013 had the U.S. dollar on one side of the currency pair.

56.     Physical settlement of an FX trade occurs when the traders each deposit the agreed-upon quantities of currencies into the other party's account.  Because each country has its

own currency as its form of legal tender, the two payments are generally performed in different countries. For example, in a trade of USD for GBP, the USD are deposited in the purchasing trader's U.S. bank account, and GBP are deposited to the opposing trader's account in the United Kingdom.

57.     The advent of electronic FX trading has had a substantial impact on the FX market. Although large bank dealers such as Defendants still account for a large majority of all trades, electronic trading has enabled smaller companies and individuals to transact directly with Defendants and other dealer banks. Electronic trading also enabled traders to employ new FX trading strategies. Large, sophisticated traders have employed strategies such as rapid-fire arbitrage and algorithmic trading. Electronic trading also enabled Defendants and co-conspirators to collusively manipulate FX benchmark rates, as alleged herein.

58.     Traders in the FX market engage in several types of transactions. According to the Bank for International Settlements ("BIS"), the four most common types of FX transactions are:

    a.    **Spot transaction** – an agreement to exchange sums of currency at an agreed-upon exchange rate on a value date that is within two business days' time;

    b.    **Forward outright transaction** – an agreement to exchange sums of currency at an agreed-upon exchange rate on a value date that will be in more than two business days' time;

    c.    **Forward swap** – a spot transaction plus a forward outright transaction, at a different exchange rate and in the reverse direction; and

    d.    **Currency option –** a "put" or a "call" option contract on a specified quantity of FX. A "put" option contract gives the owner the right to sell a specified quantity of currency at a specified exchange rate. A "call" option contract gives the holder the right to buy a specified quantity of currency at a specified rate.

59.     In 2013, forward swaps accounted for 42 percent of the total FX trade volume. Spot transactions accounted for 38 percent, forward outrights accounted for 13 percent, and currency options and other FX transactions accounted for 7 percent.

60.     Spot transactions occur in the private OTC market, which is dominated by Defendants.  To initiate a spot transaction, a customer contacts a dealer bank, such as one of the Defendants, for a quote.  These dealer banks are known as "market makers" or "liquidity providers."

61.     A spot transaction occurs when one party contacts a dealer for a "bid-ask" quote on a designated quantity of currency, and the party accepts the dealer's quote.  The "bid" is the price at which the dealer is willing to buy a given quantity of currency, and the "ask" is the price at which the dealer is willing to sell the same quantity of currency.  FX dealers provide exchange rate quotes on demand.

62.     Dealers generally provide quotes for USD and EUR to four decimal points, with the final digit known as a "percentage in point" or "pip."  For example, suppose EUR/USD is quoted 1.1952-1.1954 on $10 million.  The first number, 1.1952, is the bid, and the second, 1.1954, is the ask.  The party receiving the quote can either sell $10 million USD and receive €8,366,800.54 EUR ($1.1952 per Euro) in exchange, or purchase $10 million USD for €8,365,400.70 EUR ($1.1954 per Euro).

63.     The difference between the bid and the ask is called the "bid-ask spread."  The bid-ask spread enables large bank dealers to profit from FX trades by buying and selling FX at different exchange rates.

64.     Trades can be executed through several different methods, including:

    a.      **Interbank** – trades that are executed between two dealers;

b.    **Customer direct** – trades that are executed directly between a dealer and a non-dealer;

c.    **Electronic broking systems –** trades that are executed by automated systems that match currency buyers with sellers;

d.    **Electronic trading systems –** trades are executed through a single dealer's proprietary trading platform or a multibank platform; and

e.    **Voice brokers –** trades are executed over the phone with an FX broker.

65.    Customers trading with a dealer such as one of the Defendants can execute FX spot transactions either by a direct telephone call, by sending an electronic message to a salesperson at a dealer bank, or through an electronic trading system.  Electronic trading systems are computer trading platforms that customers can use to execute orders with dealers over a network.  Electronic trading systems can be proprietary platforms operated by a single dealer, or a multi-bank platforms that allows customers to trade with multiple dealers.  Major multi-bank FX trading platforms include Reuters, Bloomberg, EBS, Hotspot, and Currenex.

66.    Dealers employ salespeople to interact with customers through electronic platforms, electronic messages, and telephone calls.  Dealers also employ FX currency traders to oversee bid-ask quotes and process trades.  A dealer's salespeople and traders are in constant communication.  Salespeople inform the traders of incoming potential orders, confirm bid and ask quotes, and convey orders to the trading desk for processing.  Traders receive information about potential and pending trades before the trades are actually processed.  Traders also record and analyze their customers' trading histories.  As a result, dealers can often predict a customer's trading patterns, even before a customer places an order.

67.    Spot transaction exchange rates are the foundation for pricing of all FX Instruments.  The prices for forward outright trades, forward swap trades, currency option contracts, and all other FX Instruments are all derived from the underlying FX spot rates.

68.     Because all FX transactions are affected by spot prices, Defendants' manipulation of benchmark spot rates had widespread effects on all FX trading throughout the Class Period.

**B.      Benchmark Rates**

69.     In placing FX spot trades, customers often use what are called benchmark rates, daily fixing rates, or "Fixes."  A daily fixing rate is a published exchange rate based on FX trades placed in a moment in time or a short interval of time.  Several different fixing rates are published by private parties and central banks.  To place an order at a Fix, a customer gives an FX dealer instructions to buy or sell a quantity of currency at a specific daily fixing rate.  The dealer guarantees execution at whatever rate the Fix is later posted.

70.     Trades at the Fixes are especially popular with managers of investment portfolios held by mutual funds, pension funds, ETFs, and other FX Investment Vehicles.  An investment vehicle's performance is often compared to benchmarked U.S. dollar rates of return constructed using the fixing rates.  Placing FX trades at the Fixes is thought to remove a source of random noise from their investment vehicle's performance when compared to indexed benchmarks.

71.     Fixing rate trades are also frequently used by FX Investment Vehicles to convert proceeds from foreign financial instruments into U.S. dollars.  When an investment vehicle based in the U.S. receives payments from a foreign entity, such as dividends, interest payments, or redemptions on foreign equity or debt holdings, those payments are made in foreign currency.  Upon receiving foreign payments, investment funds commonly convert the foreign currency to U.S. dollars by placing an FX spot trade at one of the Fixes with a dealer such as one of the Defendants.  Investment funds that trade in foreign assets are continuously re-balancing their currency holdings in this way.  Trading at the Fixes is popular with investment vehicles because the Fixes are perceived as universally accepted exchange rates that are independent from any single dealer.

72.     Prior to the publishing of the Fixes, customers will place orders with dealers to buy or sell a specific quantity of FX at a specified Fix.  Because these orders are placed in advance of the fixing rates being published, dealers that accept spot trade orders at the Fixes are exposed to unexpected movements in currency prices.

73.     Dealers can take advantage of the interim between the time a customer places a fixing rate order and the time the fixing rate is published.  If a dealer is able to buy the ordered quantity of currency at a price that is less than the fixing rate, the dealer profits from the customer's order.  However, if a dealer pays more than the fixing rate, it loses money on the order.

74.     Because the Fixes are so widely recognized as benchmark rates in the FX market, they play a crucial role in FX trading and in the pricing of all FX Instruments.

### 1.     WM/Reuters

75.     While there are a number of published fixing rates available to FX market participants, the most widely used fixing rate is the WM/Reuters Closing Spot Rates (the "WM/Reuters Fix" or "4:00 p.m. Fix"), which are set at 4:00 p.m. London time (11:00 a.m. New York time).  WM/Reuters is a joint venture between the WM Company (a wholly-owned subsidiary of State Street Corporation) and Thomson Reuters.  The WM/Reuters Closing Spot Rates are widely used because they are set around the time when the FX market is most liquid – near the end of the trading day in London, while the New York market is also open. WM/Reuters calculates fixing rates for major currencies every half hour from 6:00 a.m. in Hong Kong/Singapore to 10:00 p.m. in the U.K., and they publish fixing rates for spot rates and forwards.

76.     WM/Reuters calculates the 4:00 p.m. Fix based on actual bids and offers placed on certain electronic trading systems during a one-minute window ("the fix period").  The fix

period begins 30 seconds before 4:00 p.m. London time and ends 30 seconds after.  WM/Reuters uses bids and offers placed on the Currenex, Reuters Dealing 3000, and EBS electronic trading systems.

77.      The consolidation of trading information and calculation of the 4:00 p.m. Fix rates is automated.  WM/Reuters bases the 4:00 p.m. Fix rates on the median exchange rates of the FX transactions placed during the fix period, but the volumes of those trades placed during the fix period are not taken into account.  This makes the 4:00 p.m. Fix especially vulnerable to concerted manipulation.

78.      WM/Reuters also provides fix rates for FX forwards, which are published as premiums or discounts to the WM/Reuters spot rates.  Thus, when the WM/Reuters Fix rates were manipulated by Defendants as alleged herein, WM/Reuters forward fix rates were also directly affected.

### 2.     The ECB Rates

79.      The European Central Bank ("ECB") reference rate provides FX spot rate Fixes throughout the day for currency pairs that are traded against the euro.  After the WM/Reuters Fixes, the ECB reference rate ("ECB Fix" or "1:15 p.m. Fix") is the second-most widely used global FX benchmark rate.

80.      The ECB Fix publishes the exchange rate for various euro-denominated currency pairs, as determined by the European Central Bank, based on FX spot trades placed at or around 1:15 p.m. GMT.  For each currency pair, the ECB publishes one rate for the 1:15 p.m. Fix.  The ECB Fixes are published on the ECB's website shortly after they are calculated.

### C.     The FX Market Is Concentrated and Dominated by Defendants

81.      Beginning in the late 1990s, the FX market experienced a significant increase in concentration.

82.     Defendants dominated the FX market throughout the Class Period, and continue to do so today.  In 2013, Defendants collectively controlled more than 90 percent of the global FX market.  According to the 2012 and 2013 FX Surveys by industry publication EUROMONEY, the individual and aggregate shares of the global FX market for Defendants and their affiliated corporations in 2012 and 2013 were, respectively:

| Defendant | 2012 Market Share (Rank) | 2013 Market Share (Rank) |
|---|---|---|
| Deutsche Bank | 14.57% (1) | 15.18% (1) |
| Citigroup | 12.26% (2) | 14.90% (2) |
| Barclays | 10.95% (3) | 10.24% (3) |
| UBS | 10.48% (4) | 10.11% (4) |
| HSBC | 6.72% (5) | 6.93% (5) |
| JPMorgan | 6.60% (6) | 6.07% (6) |
| RBS | 5.86% (7) | 5.62% (7) |
| Credit Suisse | 4.68% (8) | 3.70% (8) |
| Morgan Stanley | 3.52% (9) | 3.15% (9) |
| Goldman Sachs | 3.12% (10) | 2.75% (11) |
| BNP Paribas | 2.63% (11) | 2.52% (12) |
| Bank of America | 2.41% (12) | 3.08% (10) |
| Société Générale | 1.76% (13) | 1.57% (13) |
| Standard Chartered | 0.89% (18) | 0.91% (17) |
| RBC | 0.84% (19) | 0.88% (18) |
| BTMU | 0.24% (30) | 0.31% (23) |
| **Defendants' Aggregate Market Share:** | **90.86%** | **90.92%** |

83.     The FX market in the U.S. is even more concentrated and dominated by Defendants than the FX global market.  According to the Federal Reserve Bank of New York, the top ten banks in April 2013 were responsible for 98 percent of all FX spot trade volume in the United States, and the top five banks alone accounted for 80 percent.  According to the Foreign Exchange Committee's April 2012 survey of the North American FX market, the five largest FX dealers in North America had a 75 percent market share for spot transactions, and a 61.2 percent market share for all forward outright transactions.  The next five largest dealers had

a 17.7 percent market share for spot transactions and a 26.5 percent market share for forward outright transactions.

84.     Traders employed by Defendants have significant influence on the FX market. Collectively, these traders account for a substantial majority of all FX trades.  Defendant traders are a small, interconnected group.  Many have worked with one another in prior trading jobs, and traders frequently communicate and socialize with traders at other Defendant dealers.  The strong familiarity among traders facilitated Defendants' collusive conduct alleged herein.

### D.     The FX Market Is Susceptible to Collusion

85.     Because it lacks a central organizing body, the FX market is one of the least regulated financial markets in the world.  Most trading takes place in the OTC market, away from centralized exchanges.  The U.S. does not have any specific laws or regulations governing FX transactions conducted between two private traders.

86.     No centralized exchange or institution publishes real-time trade information for the OTC market.  Defendants' proprietary dealing platforms allow their traders to view real-time orders and trade volume data, but Defendants do not make this information available to private traders.  Absent an agreement to collude, each individual Defendant would not have access to information about other Defendants' trade orders, and it would be in the economic interest of each Defendant to keep its own trade data confidential.

87.     Based on trade volume and price information from their own FX trades, Defendants can analyze trading patterns, predict the direction of FX market movements, and exploit this information.  A single dealer can only predict FX trading patterns if it has access to a large sample size of FX trading data.  Private traders do not have this proprietary trading data, and are therefore unable to analyze and accurately predict FX trading patterns.

29

88.     Defendants' ability to predict and exploit FX trading patterns substantially grows when they share confidential trade information with one another.

89.     Throughout the Class Period, Defendants maintained internal accounts allocable to individual FX traders, sometimes called "P-books," that allowed traders to trade and speculate on FX with bank funds.  Revenues generated in an individual trader account accrued to the benefit of the trader's employer bank, and those revenues were taken into account by Defendants for purposes of evaluating and determining each trader's performance, promotion potential, salary, and bonuses.  Because aggregate trade data from multiple Defendants allows traders to predict and manipulate the movement of the market around the times of the Fixes, Defendants' maintenance of these "P-book" accounts incentivized traders to collude with traders at other Defendant dealers to manipulate FX rates.

90.     With high concentration among Defendants in the FX market, a lack of government regulation, high barriers to entry, institutional incentives for traders to cheat, and limited non-dealer access to pricing and trade information, the unique characteristics of the FX market make it highly susceptible to collusive activity.

## II.     DEFENDANTS CONSPIRED TO FIX FX PRICES

91.     Beginning on or before December 1, 2007, Defendants conspired with one another to fix prices in the FX market on a daily basis.  In furtherance of the conspiracy, Defendants manipulated the exchange rates of over two dozen of the most frequently traded currency pairs.

92.     Defendants' conspiracy involved, *inter alia*: (1) the fixing of FX bid/ask spreads; and (2) the fixing of benchmark FX rates, including, but not limited to, the WM/Reuters Fixes and the ECB Fix.

93.     In furtherance of their conspiracy, Defendants: (1) created and participated in chat rooms and other forms of electronic communication; (2) shared confidential client and proprietary trading information with other Defendants involved in the conspiracy; (3) coordinated trades with other Defendants in order to illegally manipulate FX Fixes and spot rates; (4) monitored the trades placed by traders employed by co-conspirator Defendants in order to ensure compliance with the conspiracy; and (5) used code names and code words in efforts to evade detection.

94.     As a result of Defendants' conspiracy, Plaintiffs and the members of the Classes were injured in the form of overcharge on FX Instruments purchased indirectly from one or more Defendants or co-conspirators during the Class Period.

**A.      Defendants Conspired to Fix Prices and Carried Out the Conspiracy through Electronic Communications**

95.     Defendants' top-level traders held secret online meetings in chat rooms throughout the Class Period.  Plaintiffs are aware of thousands of electronic communications made between traders employed by dozens of banks, including each Defendant, in which traders coordinated trades and exchanged information about orders, spreads, exchange rates, and Fixes. For example:

a.      Bank of America participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Japanese yen (JPY), Australian dollar (AUD), Swiss franc (CHF), and South African rand (ZAR).

b.      Barclays participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Japanese yen (JPY), Swiss franc (CHF), Australian dollar (AUD), Canadian dollar (CAD), Russian ruble (RUB), and South African rand (ZAR).

31

c.      BNP Paribas participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Japanese yen (JPY), Russian ruble (RUB), Mexican peso (MXN), and Thai baht (THB).

d.      BTMU participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Japanese yen (JPY), and Swiss franc (CHF).

e.      Citigroup participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Japanese yen (JPY), Australian dollar (AUD), New Zealand dollar (NZD), and South African rand (ZAR).

f.      Deutsche Bank participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), the British pound (GBP), Japanese yen (JPY), Swiss franc (CHF), Australian dollar (AUD), New Zealand dollar (NZD), Canadian dollar (CAD), Russian ruble (RUB), South African rand (ZAR), Chinese yuan (CNY), Czech koruna (CZK), Hong Kong dollar (HKD), Singapore dollar (SGD), Turkish lira (TRY), Indonesian rupiah (IDR), Indian rupee (INR), and South Korean won.

g.      Goldman Sachs participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), and Australian dollar (AUD).

h.      HSBC participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Swiss franc (CHF), Russian ruble (RUB), Mexican peso (MXN), and Thai baht (THB).

i.      JPMorgan participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), and Swiss franc (CHF).

j.      Credit Suisse participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Australian dollar (AUD), Swiss franc (CHF), Czech koruna (CZK), and South African rand (ZAR).

k.      Morgan Stanley participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), and Japanese yen (JPY).

l.      RBC participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Australian dollar (AUD), New Zealand dollar (NZD), Canadian dollar (CAD), Swiss franc (CHF), and Japanese yen (JPY).

m.      RBS participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Japanese yen (JPY), Swiss franc (CHF), Australian dollar (AUD), and New Zealand dollar (NZD).

n.      Société Générale participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Australian dollar (AUD), Polish zloty (PLN), Brazilian real (BRL), Mexican peso (MXN), Chinese yuan (CNY), Israeli shekel (ILS) and Thai baht (THB).

o.      Standard Chartered participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Japanese yen (JPY), and Brazilian real (BKL).

p.      UBS participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Japanese yen (JPY), Swiss franc (CHF), Australian dollar (AUD), New Zealand dollar (NZD), Canadian dollar (CAD), Chinese yuan (CNY), Singapore dollar (SGD), South Korean won (KRW), and Taiwan dollar (TWD).

96.     The secret chat rooms were controlled by Defendants' top-level traders. Defendants referred to chat groups with names such as "The Cartel," "The Bandits' Club," "One Team, One Dream," "the 3 musketeers," "the A-team," "The players," "the Essex Express," and

"The Mafia."  The "Essex Express" focused on trading Japanese yen and included traders from

UBS, Barclays, RBS, and BTMU.  "The Mafia" included traders from Citigroup, Credit Suisse,

and UBS.

97.    Defendant traders participating in these secret chat rooms shared their

"positions"—the amount of a specific currency that they had orders to trade at the Fix—prior to

the WM/Reuters 4:00 p.m. Fix and other Fixes.  For example, in one chat room transcript

involving traders from RBS and HSBC, the traders shared their positions prior to 4:00 p.m., then

congratulated each other on successfully manipulating the rate after the 4:00 p.m. Fix:

| Trader | Time (U.S. Eastern) | Message |
|--------|--------------------|---------|
| RBS | 15:45:35 | im getting abt 80 quid now…fixing |
| HSBC | 15:45:54 | my ny 100 quid |
| RBS | 15:51:19 | getting more than u now [HSBC Trader] betty |
| HSBC | 15:51:26 | ok thx |
| Bank W | 15:52:23 | nice job gents |
| HSBC | 15:54:16 | [RBS Trader], just matched with [Bank 1] and [Bank 2] for 100, still lhs in about 140 |
| RBS | 15:54:26 | Cool |
| Bank Z | 16:00:58 | i don my hat |
| Bank W | 16:01:08 | what a job |
| Bank Z | 16:01:23 | welld one lads |
| Bank W | 16:01:28 | Bravo |
| RBS | 16:07:03 | 1.6218..nice |
| HSBC | 16:07:33 | worked ok that one |

98.    Many of Defendants' FX traders participated in multiple chat rooms, allowing

them to communicate with many other Defendants each day.  For example, in several chat room

transcripts that were uncovered by the Commodities Futures Trading Commission ("CFTC") in

its investigation into Defendants' conduct, an HSBC trader participated in four separate chat

rooms in the minutes leading up to the 4:00 p.m. Fix.  First, the HSBC trader entered a chat room

to disclose to traders at Barclays and other banks that he was a seller in "cable" (GBP/USD):

| Trader | Time (U.S. Eastern) | Message |
|--------|--------------------|---------|
| Barclays 1 | 2:50:21 p.m. | early days but im a seller cable at fix [. . .] |

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| Bank S | 3:11:43 p.m. | here also |
| Bank R | 3:24:50 p.m. | u got much to do in fix [Bank Trader W] |
| Barclays 1 | 3:25:07 p.m. | im seller 130 cable that it [. . .] |
| Barclay 1 | 3:28:02 p.m. | hopefulyl a fe wmore get same way and we can team whack it |
| Bank R | 3:28:17 p.m. | ill do some digging [. . .] |
| Barclays 1 | 3:36:13 p.m. | im seller 170 gbp atmofix |
| Bank R | 3:36:26 p.m. | we sellers of 40 |
| HSBC | 3:38:26 p.m. | lhs in cable at the fix |
| HSBC | 3:38:29 p.m. | good amount [. . .] |

As the 4 p.m. Fix period closed, the participants in the chat room congratulated each other:

| Bank R | 4:00:35 p.m. | well done gents |
|---|---|---|
| Barclays 1 | 4:01:56 p.m. | hooray nice team work |
| HSBC | 4:02:22 p.m. | nice one mate |

Prior to the Fix that same day, the HSBC trader participated in a separate chat room and

conveyed the information he had learned in the first room to another Barclays trader:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| HSBC | 3:25:19 p.m. | get lumpy cable at the fix ok |
| Barclays 2 | 3:25:32 p.m. | ta mate |
| Barclays 2 | 3:25:35 p.m. | 150 here |
| HSBC | 3:25:46 p.m. | 400 odd here |
| HSBC | 3:25:50 p.m. | lets go |
| Barclays 2 | 3:26:00 p.m. | yeah baby |
| HSBC | 3:26:03 p.m. | [Barclays Trader 1] is too [. . .] |
| Barclays 2 | 3:27:00 p.m. | sry thats the [Barclays] flow |
| Barclays 2 | 3:27:23 p.m. | [Barclays Trader 1] gets |
| HSBC | 3:28:26 p.m. | so its 150 all day wiht you guys? [. . .] |
| Barclays 2 | 3:36:34 p.m. | 170 here |

As the 4 p.m. Fix period closed, HSBC and Barclays traders celebrated:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| Barclays 2 | 4:01:03 p.m. | nice job mate |
| HSBC | 4:03:34 p.m. | haha |
| HSBC | 4:03:40 p.m. | i sold a lot up there |
| HSBC | 4:03:46 p.m. | and over sold by 100 |
| HSBC | 4:03:48 p.m. | hahaha [. . .] |
| Barclays 2 | 4:04:06 p.m. | sweet nice job [. . .] |
| Bank W 2 | 4:05:04 p.m. | bravo |

35

At the same time, the HSBC trader disclosed that he was selling at the Fix in yet another private

chat with a trader at an unknown bank prior to the close of the Fix period:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| HSBC | 3:28:45 p.m. | lhs in about 300 quid cable for the fix |
| Bank V | 3:28:54 p.m. | sweet |
| HSBC | 3:29:42 p.m. | can you do some digging and seeif anyoine is that way |
| Bank V | 3:29:52 p.m. | ofcourse mate |
| Bank V | 3:34:49 p.m. | im getting 83 at mom mate |
| HSBC | 3:34:56 p.m. | nice [. . .] |
| Bank V | 3:37:38 p.m. | someone tells a guy here he is getting 170 cble at fix |
| Bank V | 3:43:28 p.m. | see that [Bank U Trader] |
| HSBC | 3:43:57 p.m. | thx |

As the 4 p.m. Fix period ended, the traders continued:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| Bank V | 4:00:51 p.m. | have that my son |
| Bank V | 4:00:52 p.m. | hahga |
| Bank V | 4:00:56 p.m. | v nice mate |
| HSBC | 4:04:53 p.m. | that worked nice mate |
| Bank V | 4:05:44 p.m. | big time mate. |

In a fourth chat room, the HSBC trader disclosed his position to traders at Barclays and other

banks prior to the close of the Fix period.  The traders shared information about the size and

direction of the net orders at the Fix period:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| Barclays 2 | 3:36:18 p.m. | see first seller now |
| Bank Z | 3:36:48 p.m. | you gettingt betty3 on the mumble still [Barclays Trader 2] ? |
| Bank Z | 3:36:51 p.m. | we have nowt |
| Barclays 2 | 3:36:56 p.m. | yep |
| Barclays 2 | 3:36:59 p.m. | 170 |
| Bank Z | 3:37:05 p.m. | ta |
| Bank Z | 3:37:21 p.m. | get it up to 60/70 then bash the fck out of it |
| HSBC | 3:38:26 p.m. | lhs in cable at the fix |
| HSBC | 3:38:29 p.m. | good amount |
| Bank Z | 3:38:35 p.m. | ta [. . .] |
| Bank Z | 4:00:28 p.m. | nice work gents |

36

By participating in multiple chat rooms and sharing information, Defendants were able to amplify their influence on the FX market and successfully manipulate FX rates.

99.     Defendants' traders that were involved in the conspiracy actively monitored the activity of other co-conspirator traders in order to ensure compliance.  Traders that failed to comply with the conspiracy were threatened with punishment by other Defendant traders.

100.     Only a select group of traders were allowed into the secret groups, and traders were highly protective of their membership.  In a December 2011 chat room conversation that was also uncovered by the CFTC, three Defendant traders discuss inviting another trader from Barclays into their chat group:

| Trader | Time | Message |
| --- | --- | --- |
| Matt Gardiner (UBS) | 7:49:55 | are we ok with keeping this as is . . . |
| | 7:50:27 | ie the info & risk sharing? |
| Rohan Ramchandani (Citigroup) | 7:50:27 | Well . . . |
| Matt Gardiner (UBS) | 7:50:30 | that is the qu[estion] |
| Rohan Ramchandani (Citigroup) | 7:50:32 | you know him best obv . . . |
| | 7:50:39 | if you think we need to adjust it |
| | 7:50:43 | then he shouldn't be in chat |
| Richard Usher (JPMorgan) | 7:50:54 | yeah that is key |
| | 7:51:00 | simple question . . . |
| | 7:51:08 | I trust you implicitly . . . |
| | 7:51:13 | and your judgement |
| | 7:51:16 | you know him |
| | 7:51:21 | will he tell rest of desk stuff |
| | 7:51:26 | or god forbid his nyk [New York office] |
| Rohan Ramchandani (Citigroup) | 7:51:46 | yes |
| | 7:51:51 | that's really imp[ortant] qu[estion] |
| | 7:52:01 | don't want other nuptys in mkt to know |
| | 7:52:17 | but not only that |
| | 7:52:21 | is he gonna protect us |
| | 7:52:33 | like we protect each other against our own branches |
| | 7:52:46 | ie if you guys are rhs [right hand side, a code for buying the first currency listed in a currency pair] and my nyk is lhs [left hand side] . . . ill say my nyk [New York office] lhs in few |

| Matt Gardiner (UBS) | 7:53:52 | what concerns me is that i know he'll never tell us when at risk |
|---|---|---|

Following further discussion about whether the Barclays trader would "add huge value to this cartell," the three traders agreed to invite the Barclays trader into the chat room for a "1 month trial," although Citigroup trader Rohan Ramchandani warned the Barclays trader, "mess this up and sleep with one eye open at night."

101.    The Defendant traders involved in the chat rooms regularly participated in FX rate manipulations.  For example, in a November 4, 2010 chat, a Barclays trader discussed manipulating the USD/South African Rand rate with a JPMorgan trader, stating, "if you win this we should coordinate you can show a real low one and will still mark it little lower haha."  The JPMorgan trader acknowledged the illegality of their scheme, suggesting that they "prolly shudnt put this on perma chat."  The Barclays trader responded, "if this is the chat that puts me over the edge than oh well. much worse out there."  Weeks later, on November 17, 2010, the same Barclays trader entered a chat room and told traders at other banks to "show them way to the left . . . if they come here I will show them little worse . . . you win . . . and get them cheap."  Months later, in a chat room on February 25, 2011, a Standard Chartered FX trader asked "what bid you want me to show if somwone calls" and the Barclays trader responded "up to 02."  The Standard Chartered trader replied, "okok" and "ill let you know if we get asked."  Later that year, on June 10, 2011, the Barclays trader showed up in another chat room to tell other traders that "we trying to manipulate it a bit more in ny now . . . a coupld buddies of mine and I."

102.    Defendants' traders used the chat rooms to coordinate their trades in order to move exchange rates in directions that favored Defendants, to the detriment of non-conspirator market participants.

103.    Defendants used code words in the chat rooms in efforts to evade detection by governmental authorities.  For example, one message uncovered by regulators from a chat room involving traders from HSBC and Barclays said: "You getting betty on the mumble still?  We have nowt . . . Get it up to 60/70 then bash the fck out of it."  "Betty" in the message is a reference to Betty Grable, and Grable rhymes with cable – the term for USD/GBP trades.

**B.      Defendants Conspired to Fix Bid/Ask Spreads**

104.    Beginning at least as early as December 1, 2007, as part of their conspiracy to fix prices in the FX market, Defendants conspired to fix the bid-ask spreads paid by customers for various currency pairs.  As alleged above, there are thousands of electronic communications between traders at two or more Defendant banks discussing FX bid-ask spreads and colluding to manipulate FX rates.

105.    Defendants quote bid-ask spreads directly to customers on demand throughout the trading day.

106.    Through electronic communications, traders employed by Defendants and their co-conspirators exchanged information about bid-ask spreads and customer orders, and coordinated quotes and orders between banks.

107.    Bid-ask spreads are a primary source of revenue for FX dealers, and in a competitive FX market, absent collusion, a profit-maximizing dealer would seek to gain customers and market share by beating the spreads offered by competitor dealers.  On the other hand, a decision to increase bid-ask spreads would result in a loss of customers to dealers with more advantageous quotes.  Customers want narrower spreads, allowing them to buy currency at lower prices and sell currency at higher prices.  Only through coordinated price fixing could an FX dealer quote less desirable bid-ask spreads without losing market share.

C.    **Defendants' Conspiracy to Fix the Benchmark Rates**

108.    Beginning at least as early as December 1, 2007, Defendants conspired to manipulate the Fixes.

109.    Defendants' traders carried out their conspiracy by communicating via chat rooms, instant messages, and email.  Through these communications, Defendants regularly shared confidential pricing and order information before the Fixes.  Armed with this shared confidential information, Defendants executed coordinated trading strategies designed to manipulate the Fixes.

110.    Defendants' conspiracy was successful in manipulating the Fixes, allowing Defendants to earn supracompetitive profits to the detriment of non-conspirator traders, including Plaintiffs and members of the Classes.

1.    **Defendants Shared Proprietary Trade Data In Order To Manipulate FX Benchmark Rates**

111.    Defendants regularly shared confidential customer trade data with traders employed at other Defendant dealers.  Each Defendant compiled trade order data to determine the amount of currency that it needed to buy or sell at the Fixes.  Defendants then shared that data with other Defendants through secret electronic communications, enabling each Defendant to predict the movement of FX prices during and around the times of the Fixes.

112.    Defendants' sharing of information allowed their traders to predict how the market would move around the times of the Fixes much more accurately than they could without the sharing of proprietary information.

113.    The sharing of confidential customer FX information violates the Federal Reserve Bank of New York's "Guidelines for Foreign Exchange Trading Activities."  Specifically, the Guidelines provide:

Confidentiality and customer anonymity are essential to the operation of a professional foreign exchange market.  Market participants and their customers expect that their interests and activity will be known only by the other party to the transaction . . . and an intermediary, if one is used.  It is inappropriate to disclose, or to request others to disclose, proprietary information relating to a customer's involvement in a transaction except to the extent required by law or upon the request of the appropriate regulatory body.

* * *

Staff should not pass on confidential and nonpublic information outside of their institution.  Such information includes discussions with unrelated parties concerning their trades, their trading positions, or the firm's position.  It is also inappropriate to disclose, or to request others to disclose, information relating to a counterparty's involvement in a transaction except to the extent required by law.  Institutions should develop policies and procedures governing the internal distribution of confidential information.  Trading room staff should take special precautions to avoid situations involving or appearing to involve trading on nonpublic information.

114.    Rather than taking precautions to prevent the sharing of nonpublic information, as required by the Federal Reserve Guidelines, Defendants actively shared information about customers, transactions, pending orders, and other nonpublic information.

## 2.    Methods of Manipulating Benchmark Rates

115.    Defendants employed a number of strategies in collusively manipulating the Fixes.  Defendants had various nicknames for these strategies, including "trading ahead," "front-running," "banging the close," "painting the screen," "netting off," "building," "giving the ammo," "taking the ammo," "taking out the filth," and "clearing the decks."

116.    All of these strategies were accomplished by Defendants sharing confidential customer trade information with one another in order to gain anticompetitive advantage in the FX market and increase their chances of profiting from trades placed at the Fixes.

117.    Defendants' traders engaged in a market manipulation strategy called "trading ahead" when their shared customer trade order data indicated that trades placed at and around the Fix would move FX rates in a particular direction.  If the trade data indicates that trades placed

around the Fix will cause a particular currency to rise in value, privy traders would order that currency in advance of the Fix and/or sell after the Fix, and profit from the gains.

118.    FX Investment Vehicles, credit card companies, and other high-volume traders often place substantial FX orders at the Fixes as much as an hour before the Fixes are actually set.  Sharing information about these upcoming trades allowed Defendants to predict the direction that the market would move for certain currencies.

119.    Absent collusion, no single Defendant would have had sufficient trade data to profitably predict the movement of the market around the times of the Fixes.  Although Defendants collectively dominated the market, no Defendant had sufficient market share to consistently and accurately project the direction of the market based solely on its own customer orders.

120.    In order to avoid the risk of incorrectly guessing the direction of the market leading up to and after the Fix, Defendants regularly agreed through secret communications to collectively "front run" or "trade ahead," working together to sequence their customers' orders in order to push the an FX rate in a certain direction, then buying or selling the FX for a profit. Defendants employed this strategy to manipulate the WM/Reuters Fixes and the ECB Fixes.

121.    In one detailed example of "front running" trader manipulation uncovered by the United Kingdom Financial Conduct Authority ("FCA"), an HSBC trader coordinated with co-conspirators at Barclays and other banks to manipulate the 4:00 p.m. Fix for GBP/USD by placing multiple smaller trades leading up to the Fix, then placing large trades at the Fix to take advantage of the manipulated rate.  At around 3:30 p.m., the HSBC trader entered a chat room and told traders "Let's go."  A trader at another bank replied "yeah baby," then "hopefuulyl a fe wmore get same way and we can team whack it."  A third trader encouraged the second trader to

"bask the fck out of it."  The first trader informed the HSBC trader that he had a deal with another bank, which was buying: "Taken him out . . . so shud have iot rid of main buyer for u . . . im stilla seller of 90 . . . gives us a chance."  HSBC ended up selling £70 million between 3:32 p.m. and the start of the Fix period.  Those early trades were designed to take advantage of the expected downwards movement in the Fix rate following the discussions within the chat room.  In that time period, the GBP/USD rate fell from $1.6044 to $1.6009.  The HSBC trader then sold £311 million during the Fix period.  HSBC, Barclays, and the two other banks involved in the chat room accounted for 63 percent of the volume of sales on the Reuters electronic trading platform that day.  The 4:00 p.m. Fix price was $1.6003, and HSBC's profit in this trade was $162,000.  After the Fix, the four traders congratulated each other on a successful manipulation, chatting: "Nice work gent . . . I don my hat," "dont mess with our ccy [currency]," "loved that mate . . . worked lovely . . . pity we couldn't get it below the 00 [below $1.6000]," and "we need a few more of those for me to get back on track this month."

      122.    In another example of "front running" uncovered by the CFTC, traders from Barclays and HSBC discussed unloading positions just prior to the WM/Reuters Fix period, commencing at 3:54 p.m.:

| Trader | Time (U.S. Eastern) | Message |
| --- | --- | --- |
| Barclays | 3:54:32 p.m. | can u let me know when are down to your last tenner |
| HSBC | 3:55:02 p.m. | ok |
| HSBC | 3:55:10 p.m. | i'm down to my last tenner |
| Barclays | 3:55:17 p.m. | ok ta |
| Barclays | 3:55:41 p.m. | just sold some more |
| HSBC | 3:55:49 p.m. | hahaha |
| Barclays | 3:55:51 p.m. | hehehe |
| Barclays | 4:00:57 p.m. | nice on[e] son |
| HSBC | 4:03:15 p.m. | learnt from a good fella |
| Barclays | 4:15:43 p.m. | there u go |
| Barclays | 4:16:48 p.m. | go early, move it, hold it, push it |

123.    In another example of "front running," traders at JPMorgan and an undisclosed

co-conspirator bank agreed to "join forces" and "double team" trades prior to the Fix:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| Bank W | 3:46:53 p.m. | i'd prefer we join forces |
| JPMorgan | 3:46:56 p.m. | perfick 3:46:59 lets do this |
| JPMorgan | 3:47:11 p.m. | lets double team them |
| Bank W | 3:47:12 p.m. | YESssssssssssss |

By the 4:00 p.m. Fix, JPMorgan had built orders of €278 million, while the other trader's orders

totaled €240 million.  JPMorgan bought €57 million in the two minutes before the Fix window,

in efforts to take advantage of the expected upwards movement in the Fix rate following the

discussions within the chat room.  During the Fix calculation period, JPMorgan bought €134

million and the other trader bought €125 million.  Between the two banks, they accounted for 41

percent of all EUR/USD trading at the Fix.  JPMorgan's profit in this trade was $33,000.  Shortly

after the fixing window, the traders congratulated themselves:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| Bank W | 4:03:25 p.m. | sml rumour we haven't lost it |
| JPMorgan | 4:03:45 p.m. | we |
| JPMorgan | 4:03:46 p.m. | do |
| JPMorgan | 4:03:48 p.m. | dollarrr |

124.    Defendants also engaged in a market manipulation strategy that they referred to as

"banging the close."  "Banging the close" refers to traders breaking large FX orders into multiple

smaller trades, in order to artificially inflate the Fixes.

125.    Because the WM/Reuters Fixes were based on the median of spot rates for trades

placed during the calculation window, but the volume of each trade was not taken into account,

the WM/Reuters Fixes were particularly vulnerable to collusive manipulation by Defendants.  By

splitting large trades into multiple smaller trades, Defendant traders working in conjunction

could manipulate the median exchange rates of trades made during the WM/Reuters calculation window, thereby manipulating the WM/Reuters Fix.

126.    Defendants also employed these strategies, including "front running" and "banging the close," to manipulate the ECB Fixes.

127.    In one example of "banging the close" in a chat room transcript uncovered by the FCA, Citigroup had net buy orders of €200 million and stood to benefit if it was able to move the ECB Fix rate upwards.  The Citigroup traders were able to "build" this order by gathering information about euro orders from other co-conspirator banks.  Traders at the other banks agreed to transfer their buy orders to Citigroup, and with these additional trades, Citigroup traders accumulated €542 million in total buy orders.  In the 15 seconds before the ECB fix, Citigroup placed four buy orders of increasing size and price, which were priced at a level above the prevailing offer price.  According to the FCA, Citigroup's trading in this case generated a profit of $99,000.

128.    The converse of "banging the close" was called "clearing the decks."  By combining small trades into a lesser number of large trades, Defendant traders could manipulate the WM/Reuters and ECB Fixes and by artificially decreasing the number of trades placed during the calculation windows for the Fixes, thereby manipulating the median exchange rates of trades made during those windows.

129.    The FCA uncovered a specific example of an RBS trader working with other banks to manipulate the WM/Reuters GBP/USD Fix by "clearing the decks" on a day when the RBS trader had net client sell orders at the Fix and would benefit if it was able to manipulate the 4:00 p.m. Fix rate lower.  In advance of the Fix, the RBS trader shared information about its Fix orders with other traders in a chat room, and the traders worked to combine, or "net off" their

trades by transferring their trades to other dealer banks and combining them into larger trades.  In

a separate chat room, RBS told three other traders: "We getting a lot Betty at fix" referring to

GBP/USD.  In the period leading up to the 4:00 p.m. Fix, RBS built up £399 million to sell at the

Fix, which was designed to take advantage of the expected downward movement in the Fix rate

following the discussions within the chat room.  RBS made $615,000 in profit on this trade.

130.    In another "clearing the decks" example, traders at RBS and other banks agreed to

share "ammo" and combine their small trades into one large trade to manipulate the Australian

dollar and New Zealand dollar:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| Bank T Trader | 3:43:32 p.m. | buying aud and nzd at the fix |
| RBS Trader | 3:43:43 p.m. | Tkx |
| Bank T Trader | 3:43:52 p.m. | ntg big |
| RBS Trader | 3:43:59 p.m. | Im buying 50 aud can do yours if you want |
| Bank T Trader | 3:45:13 p.m. | ok . . .60 plse . . .**** |
| RBS Trader | 3:45:56 p.m. | Great |
| Bank P Trader | 3:50:00 p.m. | I need to buy 25 aud at the fix too.. any int? more ammo for you…? |
| RBS Trader | 3:50:21 p.m. | Sure [Bank P Trader] |
| Bank P Trader | 3:51:24 p.m. | cool all yours [RBS Trader] |
| RBS Trader | 3:51:46 p.m. | Buying 220 now |
| Bank P Trader | 3:51:57 p.m. | good luck |
| Bank T Trader | 3:52:20 p.m. | load up your 50 offrs . . . |
| Bank P Trader | 3:53:14 p.m. | ill do those ones if you want |
| RBS Trader | 3:53:19 p.m. | haah |
| Bank T Trader | 3:53:20 p.m. | ur fkg [RBS Trader], ramp it |
| Bank T Trader | 4:00:41 p.m. | nice one ***** |
| Bank P Trader | 4:00:56 p.m. | look at you! . . . well done mate . . . |

131.    Defendants also manipulated the WM/Reuters Fixes by placing phony orders with

one another during the WM/Reuters calculation window.

### D.     Other Conduct in Furtherance of the Conspiracy

132.     In addition to fixing bid/ask spreads and the WM/Reuters and ECB Fixes, Defendants engaged in other illegal conduct in furtherance of the conspiracy by manipulating limit orders and triggering stop-loss orders.

133.     A stop-loss order is an order placed with instructions to buy or sell FX once the currency reaches a certain price. A stop-loss order is designed to limit an investor's loss on a currency position by allowing the investor to expressly limit their loss to a certain amount.

134.     When a customer places a stop-loss order to buy FX, the dealer can profit if it purchases the currency for a rate less than the price at which the customer has agreed to pay. If a customer places a stop-loss order to sell, the dealer can profit if it sells the FX for a higher average rate than the rate at which it buys the FX from the customer.

135.     Defendants frequently colluded to manipulate FX Fixes in order to move the rates towards levels that would trigger stop-loss orders and force customers to buy or sell.

## III.     DEFENDANTS' CONSPIRACY IMPACTED OTHER FX INSTRUMENTS

136.     Defendants' collusive manipulation of FX spot prices and FX Fixes directly impacted prices of other FX Instruments, including FX Exchange-Trade Instruments.

137.     The two primary FX investment contracts are futures and options. A futures contract is an agreement, like an FX outright forward, to buy or sell FX at a specified date in the future. An options contract is an agreement that gives the purchaser of the option the right to buy or sell a particular FX at a later date at an agreed-upon rate. FX futures and options contracts are traded directly with Defendants, as well as on U.S. exchanges.

138.     Each FX futures and options contract is priced based on the underlying spot rate. This pricing relationship means that when Defendants manipulated FX spot rates, their conduct directly impacted FX futures and options rates. Given this direct relationship between spot rates

47

and futures and options prices, Defendants were aware of the effects of their manipulation of FX spot prices on the prices for FX futures and options contracts.

139.    Specifically, Defendants' collusive manipulation of the WM/Reuters Fix and the ECB Fix caused FX futures and options contracts to be artificially priced.

140.    FX Investment Vehicles frequently trade FX futures and options to employ the investment strategies discussed above.  Because the FX Instruments that FX Investment Vehicles entered into with Defendants, co-conspirators, and U.S exchanges during the Class Period were artificially priced due to Defendants' conspiracy, Plaintiffs and members of the Classes who owned interests in those FX Investment Vehicles ultimately absorbed the supracompetitive overcharges on the FX Instruments.

141.    Similarly, FX Accounts are often maintained for purposes of investing in FX futures and options.  Because the FX Instruments that were purchased from Defendants and co-conspirators for FX Accounts were artificially priced due to Defendants' conspiracy, Plaintiffs and members of the Classes who owned interests in those FX Accounts ultimately absorbed the supracompetitive overcharges on the FX Instruments.

## IV.    GOVERNMENT INVESTIGATIONS OF DEFENDANTS FOR ILLEGAL CONDUCT IN FX TRADING

142.    Governmental law enforcement and regulatory authorities in the United States, United Kingdom, European Union, and several other sovereigns are conducting ongoing investigations of Defendants' conduct in the FX market.

143.    On November 11, 2014, the Commodity Futures Trading Commission brought and settled charges against Citigroup, HSBC, JPMorgan, RBS, and UBS for violations of the Commodity Exchange Act relating to their involvement in the FX manipulation conspiracy.  The CFTC settlements required the five Defendants to pay combined fines of over $1.4 billion,

including $310 million each for Citigroup and JPMorgan, $290 million each for RBS and UBS, and $275 million for HSBC.  On May 20, 2015, the CFTC brought and settled similar charges against Barclays for violations of the Commodity Exchange Act.  The CFTC settlement with Barclays requires the bank to pay $400 million in fines.

144.    On November 12, 2014, the U.S. Office of the Comptroller of the Currency ("OCC") announced that it assessed files of $250 million against Bank of America, $350 million against Citigroup, and $350 million against JPMorgan "for unsafe or unsound practices related to their foreign exchange (FX) trading businesses."  In addition to assessing monetary penalties, the OCC issued cease and desist orders requiring the three Defendants to correct deficiencies and enhance oversight of their FX trading activity.  The OCC found that between 2008 and 2013, some of the banks' traders held discussions in online chat rooms about coordinating FX trading strategies to manipulate exchange rates to benefit traders or the bank.

145.    On May 20, 2015, the U.S. Department of Justice ("DOJ") announced that Defendants Citigroup, JPMorgan, Barclays, and RBS had agreed to plead guilty to felony charges of conspiring to manipulate the prices of U.S. dollars and euros traded in the FX spot market, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  As part of the plea deals, the four Defendants agreed to pay criminal fines totaling more than $2.5 billion.  The Defendants also agreed to "a three-year period of corporate probation," and are required to cooperate in the DOJ's ongoing criminal investigations of other Defendants and co-conspirators.  Each of the four Defendants admitted in their plea agreement that "[h]ad this case gone to trial, the United States would have presented evidence sufficient to prove the following facts: . . . The defendant and its co-conspirators carried out the conspiracy to eliminate competition in the purchase and sale of the EUR/USD currency pair by various means and methods including, in certain instances, by: . .

. coordinating the trading of the EUR/USD currency pair in connection with European Central

Bank and World Markets/Reuters benchmark currency 'fixes' which occurred at 2:15 PM (CET)

and 4:00 PM (GMT) each trading day. . . ."  The four Defendants also admitted in their plea

agreements that the conspiracy began "at least as early as December 2007 and continued until at

least January 2013."

146.    Also on May 20, 2015, the DOJ announced that UBS had agreed to plead guilty

and pay a $203 million criminal penalty for illegal FX-related conduct in violation of a Non-

Prosecution Agreement that was entered into between UBS and DOJ Fraud Section on December

18, 2012.  The Non-Prosecution Agreement was signed in connection with the DOJ's previous

investigation into UBS's involvement in a conspiracy to manipulate benchmark interest rates,

including the London InterBank Offered Rate ("LIBOR").  The May 20, 2015 plea agreement

provides that "UBS expressly agrees that it shall not, through present or future attorneys,

officers, directors, employees, agents or any other person authorized to speak for UBS make any

public statement, including in litigation . . . contradicting the facts set forth in Exhibit 1."  The

facts in Exhibit 1 of the plea agreement include:

- Certain employees of UBS engaged in conduct after December 18, 2012, . . . namely, (i) fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange ("FX") market transactions with customers via telephone, email, and/or electronic chat, to the detriment of UBS's customers, and (ii) collusion with other participants in certain FX markets.";

- "UBS's compliance program . . . did not detect collusive and deceptive sales-related conduct in FX markets until an article was published pointing to potential misconduct in the FX markets."; and

- "Prior to, and continuing after [December 18, 2012], UBS, through one of its FX traders, conspired with other financial services firms acting as dealers in an FX spot market by agreeing to restrain competition in the purchase and sale of the EUR/USD currency pair in the United States and elsewhere. This was achieved by, among other things: (i) coordinating the trading of the EUR/USD currency pair in connection with ECB and WMR benchmark currency "fixes" which

occurred at 2:15 PM (CET) and 4:00 PM (GMT) each trading day, and (ii) refraining from certain trading behavior, by withholding bids and offers, when one conspirator held an open risk position, so that the price of the currency traded would not move in a direction adverse to the conspirator with an open risk position. UBS participated in this collusive conduct from in or about October 2011 and continued until at least January 2013."

147. In connection with the DOJ investigation, the U.S. Federal Reserve imposed additional combined fines of over $1.6 billion on Citigroup, JPMorgan, Barclays, RBS, and UBS.

148. Also on May 20, 2015, the New York State Department of Financial Services ("NYDFS") announced that Barclays would be required to pay $485 million and ordered the termination of eight Barclays employees who engaged in New York Banking Law violations in connection with manipulating FX rates.  Barclays admitted in the consent order with NYDFS that it had engaged in misconduct regarding the trading of FX "from at least 2008 through 2012." On November 18, 2015, the NYDFS ordered Barclays to pay an additional $150 million in fines and terminate another employee for further FX trading violations.

149. In July 2016, HSBC's global head of FX cash trading, Mark Johnson, was arrested by U.S. authorities at New York's John F. Kennedy airport on charges of conspiracy and wire fraud.  A warrant was also issued for the arrest of Stuart Scott, who was formerly Mr. Johnson's deputy and head of HSBC's FX cash trading operations for Europe, the Middle East, and Africa, until he left HSBC in 2014.  In a criminal complaint filed against Johnson and Scott on July 19, 2016, the DOJ alleges that Johnson and Scott conspired to defraud a client company by "front running" the client's $3.5 billion FX spot transaction for GBP/USD executed in December 2011.  According to the DOJ complaint, Johnson and Scott misled the client into agreeing to trade the entire $3.5 billion transaction at the WM/Reuters 3:00 p.m. Fix.  When the client agreed, Johnson and Scott discussed on a recorded phone call how high they could "ramp" up the price of GPB/USD before the client would "squeal," and then placed "front running" FX

orders in anticipation that the client's order would drive up the price of GBP/USD.  Johnson and

Scott encouraged other HSBC traders in New York and London to purchase GBP in their

individual trader "P-book" accounts, and Scott purchased GBP in his P-book account.  When the

client authorized the trade, Scott told Johnson, "full amount" (indicating that the client had

authorized the full order), to which Johnson replied, "Ohhhh, f***ing Christmas."  The DOJ

complaint alleges that HSBC earned approximately $5 million from its execution of the trade,

and an additional $3 million from trades placed in their traders' "P-book" accounts.  The DOJ

investigation of HSBC for its involvement in the FX manipulation conspiracy is currently

ongoing.

150.    On November 12, 2014, the United Kingdom Financial Conduct Authority

announced that it had imposed fines totaling £1.1 billion ($1.6 billion) on Defendants Citigroup,

HSBC, JPMorgan, RBS, and UBS for failing to control business practices in their FX trading

operations.  The FCA found that between January 1, 2008 and October 15, 2013, "the Banks did

not exercise adequate and effective control over their G10 spot FX trading businesses," and that

the Defendants' traders "shared the information obtained through [groups of traders at multiple

Defendant banks]" and "then attempted to manipulate fix rates and trigger client 'stop loss'

orders (which are designed to limit the losses a client could face if exposed to adverse currency

rate movements)."  On May 20, 2015, the FCA fined Barclays £284 million ($402 million) for

"improperly sharing confidential client information in attempts to manipulate spot FX currency

rates, including in collusion with traders at other firms, in a way that could disadvantage those

clients and the market."  The FCA press release announcing the fine stated that between January

1, 2008 and October 15, 2013, "Barclays' systems and controls over its FX business were

inadequate" and "[t]hese failings gave traders in those businesses the opportunity to engage in

behaviours that put Barclays' interests ahead of those of its clients, . . . [which] included inappropriately sharing information about clients' activities and attempting to manipulate spot FX currency rates, including in collusion with traders at other firms, in a way that could disadvantage those clients and the market."  The Bank of England is supporting the FCA in its ongoing investigation of the FX manipulation conspiracy.

151.    On July 21, 2014, the United Kingdom Securities Fraud Office ("SFO") launched a criminal investigation into allegations of fraudulent conduct in the FX market.  On December 19, 2014, the SFO arrested RBS trader Paul Nash in connection with the investigation.  The SFO also sought interviews with several former Defendant traders, including Citigroup's ex-European head of spot trading Rohan Ramchandani; Richard Usher, who moved from RBS to become JPMorgan's chief currency dealer in London; Matt Gardiner, who was at Barclays before joining UBS; and Chris Ashton, from Barclays.  The SFO closed its investigation in March 2016.

152.    The Swiss Financial Market Supervisory Authority ("FINMA") and the Swiss competition commission, "Weko," is currently investigating numerous Defendants, including RBS, Barclays, UBS, Credit Suisse, JPMorgan, and Citigroup.  FINMA initiated enforcement proceedings against UBS for suspected market abuse in FX trading in October 2013, and on November 11, 2014, FINMA announced that it was imposing several sanctions on UBS.  In addition to substantial fines, FINMA required UBS to limit salaries for FX traders and managers, and to automate at least 95 percent of its FX trading in order to limit opportunities for trader manipulation.  In December 2015, FINMA announced that it was imposing sanctions on at least six former UBS managers and traders.  The announcement noted that "[t]raders shared confidential client information, sometimes revealing the identity of clients to third parties, deliberately triggered stop-loss orders and engaged in front running.  They also repeatedly

attempted to manipulate foreign exchange benchmarks." The sanctioned former traders were banned for up to five years for their alleged participation in conspiracies to manipulate prices for FX and precious metals. FINMA and Weko are continuing their investigations of UBS and other Defendants.

153.    In 2013, the European Commission launched an antitrust investigation into allegations of manipulation of currency rates. The European Commission investigation is currently ongoing. As recently as June 2016, the European Commission asked banks to gather sales data that could be used to calculate eventual penalties.

154.    Brazil's antitrust agency, Council for Economic Defense, is currently investigating BTMU, Deutsche Bank, Credit Suisse, Morgan Stanley, RBC, and Standard Chartered, among others, for their roles in the FX manipulation conspiracy. On July 14, 2015, the Council for Economic Defense confirmed the names of 30 bankers under investigation, including former RBS and JPMorgan trader Richard Usher; current Barclays and former UBS trader Chris Ashton; Ashton's colleague and former RBS trader Michael Weston; Ashton's Barclays colleague Mark Clark; Citigroup's former European head of spot trading Rohan Ramchandani; Paul Nash from RBS; former UBS and Standard Chartered trader Matthew Gardiner; Gardiner's former boss at UBS Niall O'Riordan; and Eduardo Hargreaves from Standard Chartered.

155.    Other countries, including Germany, Singapore, Australia, South Africa, Hong Kong, and New Zealand, have opened investigations of one or more Defendants for their anticompetitive conduct in the FX market.

156.    On September 30, 2014, the Financial Stability Board, an international financial oversight body, released a report on FX benchmark rates with recommendations for reform in the

FX markets, and especially the WM/Reuters 4:00 p.m. Fix, in order to prevent wrongful manipulation of benchmark rates in the future.

157.    Several Defendants, including Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, RBS, Standard Chartered, and UBS, have confirmed in public filings that they are currently the subjects of government investigations.

## V.    DIRECT PURCHASER LITIGATION AND SETTLEMENTS

158.    On November 1, 2013, plaintiff Haverhill Retirement System filed a class action complaint in this District on behalf of persons and entities that purchased FX Instruments directly from Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, JPMorgan, RBS, and UBS, seeking damages for the same FX manipulation conspiracy alleged in this Complaint under the Section 1 of the Sherman Act.  *See* at ECF No. 1.

159.    On January 28, 2015, the court denied a motion, made by the eleven Defendant groups named at the time, to dismiss the direct purchaser claims under Rule 12(b)(6).  *See FX Direct Purchaser Litigation,* 74 F. Supp. 3d 581, 601 (S.D.N.Y 2015) (ECF No. 242).  The January opinion dismissed, however, two separate "Foreign Complaints" that alleged antitrust violations on behalf of persons who traded FX with Defendants in South Korea and Norway.  *Id.* at 589, 598.

160.    Subsequent direct purchaser plaintiffs ("Direct Purchaser Class Plaintiffs") filed complaints with similar allegations against all Defendants named in this action, on behalf of persons and entities that entered into FX Instruments directly with Defendants and directly on U.S. exchanges, seeking damages under the Sherman Act and the Commodity Exchange Act. On February 13, 2016, the *FX Direct Purchaser Litigation* complaints were consolidated before Judge Schofield in this District.  *FX Direct Purchaser Litigation*, at ECF No. 96.

161.     On October 22, 2015, the Direct Purchaser Class Plaintiffs in *FX Direct Purchaser Litigation* moved for preliminary approval of settlements ("Direct/Exchange-Only Class Settlements") totaling $2,009,075,000 with nine of the sixteen Defendant groups named in this action: (1) JPMorgan; (2) UBS; (3) Citigroup; (4) Barclays; (5) Bank of America; (6) Goldman Sachs; (7) RBS; (8) BNP Paribas; and (9) HSBC.  *Id.* at ECF No. 480.  The remaining seven Defendants groups named in *FX Direct Purchaser Litigation*, all of whom are also named in this Complaint, were not parties to the Settlements: (1) BTMU; (2) Credit Suisse; (3) Deutsche Bank; (4) Morgan Stanley; (5) RBC; (6) Société Générale; and (7) Standard Chartered.  The motion for preliminary approval also requested that the court certify two classes for purposes of the Direct/Exchange-Only Class Settlements.  *Id.*

162.     On December 15, 2015, Judge Schofield preliminarily approved the Direct/Exchange-Only Class Settlements, designated a settlement administrator, and preliminarily certified the Direct/Exchange-Only Settlement Classes.  *Id.* at ECF No. 536.

163.     On August 31, 2016, the Direct Purchaser Class Plaintiffs filed a motion for approval of a plan of notice, allocation, and distribution of the Direct/Exchange-Only Class Settlements.  *Id.* at ECF No. 653.  The Direct Purchaser Class Plaintiffs proposed that notice be mailed to potential members of the Direct/Exchange-Only Settlement Classes beginning on February 1, 2017, with a Fairness Hearing scheduled for at least five months thereafter.  *Id.* at ECF No. 654.

164.     Plaintiffs and members of the Classes proposed here owned or held FX Instruments through various means, including through FX Investment Vehicles, FX Accounts, and FX brokers.  Specifically, Plaintiffs and members of the Classes were shareholders, unitholders, account holders, or customers of members of the preliminarily certified Direct

Settlement Class and Exchange-Only Settlement Class.  Because members of the preliminarily

certified Direct/Exchange-Only Settlement Classes are allowed to recover alleged overcharges

regardless of their passing on these overcharges under the *Illinois Brick* "direct purchaser rule"

for federal antitrust claims, Plaintiffs and members of the Classes bring this action under state

*Illinois Brick* repealer and related state statutes to recover the overcharge damages that were

directly passed on to them by members of the Direct/Exchange-Only Settlement Classes.

## VI.    DEFENDANTS TERMINATED AND SUSPENDED TRADERS, FORCED TRADERS TO RESIGN, AND IMPLEMENTED INTERNAL SAFEGUARDS AFTER THE CLASS PERIOD

165.    Since allegations of Defendants' illegal manipulation of FX rates first became

public, Defendants have terminated and suspended numerous traders and trade supervisors

involved in FX operations.  Defendants have also put traders on leave and forced traders to

resign their positions.  These terminations and punitive measures highlight the seriousness of the

government investigations into Defendants' FX operations, and of Plaintiffs' allegations herein.

166.    In response to government fines and sanctions beginning in 2014, Defendants

Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley,

RBS, and UBS instituted policies banning their traders from participating in multi-bank chat

rooms.  Those Defendants also fired more than 50 FX traders and trading supervisors.

167.    Citigroup announced in February 2014 that its head of FX operations Anil Prasad

would be leaving the bank to "pursue other interests."  Citigroup also fired its head of European

FX spot trading, Rohan Ramchandani.  In addition to FX executives, Citigroup also fired and/or

suspended several less-senior FX traders.  In 2015, one of these fired Citigroup traders, Perry

Stimpson, sued Citigroup in London for wrongful discharge.  Stimpson argued at trial that he

was pressured by senior Citigroup FX employees into using electronic chat rooms to share

information with traders at other banks, and stated at trial that his "actions were normal across

the industry" and at the bank.  Several other former traders from Citigroup and other Defendant banks have brought similar wrongful termination claims against their former employers.

168.    UBS terminated and suspended a number of traders in connection with the FX investigations.  In 2013, UBS suspended its global co-head of G10 FX trading in London, Niall O'Riordan.  Also in 2013, UBS fired two traders in Singapore, Mukesh Kumar Chhaganlal and Prashan Parmeshwar Sunny Miripuri.  Chhaganlal and Miripuri sued UBS in Singapore's High Court in March 2013 for wrongful dismissal, alleging that the bank fired them to lessen UBS's perceived role in the alleged manipulation of FX rates.  In March 2014, UBS suspended at least six more traders in the U.S., Singapore, and Switzerland.  In June 2015, after UBS had paid substantial fines and conducted an independent investigation into its involvement in the FX manipulation conspiracy, UBS reinstated one of the traders that it had previously fired or suspended.

169.    Deutsche Bank in January 2014 dismissed three of its New York-based FX traders—Diego Moraiz, who dealt in Latin American currencies; Robert Wallden, a director in Deutsche Bank's New York FX trading unit; and Christopher Fahy, a managing director at Deutsche Bank's New York FX office and a former FX trader at Merrill Lynch—following an internal investigation into alleged FX manipulation.  Robert Wallden had previously been questioned by the U.S. Federal Bureau of Investigation in 2013, regarding his electronic communications with other FX traders.

170.    RBS terminated and suspended several FX employees.  In October 2013, RBS suspended London-based FX spot traders Julian Munson and Paul Nash.  In 2015, former RBS trader Ian Drysdale brought an unfair dismissal lawsuit against RBS in London.  Drysdale told a London tribunal that RBS "had to find relevant scapegoats, of which I was one," and issued a

statement claiming that "the real reason for my dismissal was to deflect attention from the respondent's (RBS's) own admitted failures."  The London judge ruled that RBS's termination of Drysdale was unfair, but awarded the trader no compensation because "[h]e, along with a number of others, was doing something he knew was fundamentally wrong."

171.    HSBC suspended two of its London-based FX traders on January 17, 2014, amid multiple government investigations into HSBC's FX operations.  One of the suspended traders was Serge Sarramegna, HSBC's chief trader for major foreign currencies.

172.    Barclays suspended at least six FX traders on or about October 31, 2013, including chief global FX dealer Chris Ashton, Tokyo trader Jack Murray, and London trader Mark Clark.  The New York Department of Financial Services required Barclays to terminate eight FX traders as a part of Barclays' penalties for its involvement in the FX rate manipulation conspiracy.

173.    JPMorgan placed senior FX trader Richard Usher, the former head of spot G10 currency trading for the bank, on paid leave in October 2013 amid government inquiries into potential manipulation of the FX market.  In October 2014, Usher formally left the bank.

174.    Goldman Sachs dismissed one of its FX traders, Frank Cahill, in November 2014 for his alleged involvement in FX manipulation.  Prior to Goldman Sachs, Cahill worked at HSBC.

175.    Bank of America suspended several senior FX traders in 2014.

176.    BNP Paribas placed several senior FX traders on leave in 2014, after the bank became a subject of government investigations into the FX manipulation conspiracy.  At least one of the suspended traders worked at Citigroup as an FX trader prior to working at BNP Paribas.

177.    Defendants have recently implemented surveillance systems to prevent their traders from manipulating the FX market in the future.  According to PricewaterhouseCoopers' 2016 Market Abuse Surveillance Survey, FX dealer banks have recently hired large surveillance teams to review messages and listen in on phone calls between traders, in order to detect and deter illegal collusion by FX traders.  The PricewaterhouseCoopers report, published in February 2016, states that FX dealer banks participating in their survey expect to substantially increase their investments in trader surveillance in the next year, with most projecting between $7 million and $14 million in additional spending.  Some banks employ as many as 50 people to parse through trader emails and messages and listen to trader calls in efforts to detect illegal conduct.

## ANTITRUST INJURY TO PLAINTIFFS

178.    As the largest and most dominant FX traders in the global financial system, and particularly in the U.S. FX market, Defendants are the primary dealers of FX to non-dealer purchasers.  Defendants are horizontal competitors, competing to buy and sell FX from the same customers by supplying quotes for FX trades.  In a competitive FX market, absent collusion, bid-ask spreads would be extremely narrow, as Defendants would drive down spreads by competing with each other to offer customers more desirable rates.

179.    Defendants' conspiracy impaired competition among dealers in the FX market. As a result of Defendants' collusion, indirect purchasers, including Plaintiffs and members of the Classes, paid higher prices for FX Instruments and interests in FX Investment Vehicles and FX Accounts that transacted FX Instruments than they would have in a competitive market.

180.    As alleged above, Defendants' manipulation of the Fixes and FX spot rates resulted in anticompetitive prices for all FX Instruments.  Thus, Defendants' manipulation of the FX market was so pervasive that Plaintiffs and the other members of the Classes could not have participated in the FX market during the Class Period without suffering damage as a result of

Defendants' anticompetitive conduct.  As a direct and proximate result of Defendants'
conspiracy, all Plaintiffs and members of the Classes were deprived of the advantageous
exchange rates that would have resulted from price competition.

181.    Defendants' conduct in furtherance of the conspiracy impaired customers such as
Plaintiffs and the indirect purchaser Class members who participated in the FX market in several
ways.  Defendants conspired to fix prices and conform their FX trade quotes.  Defendants also
agreed to coordinate the timing and volume of trades in order to manipulate the market, to the
detriment of customers.  These actions, individually and collectively, had the effect of artificially
increasing the prices paid by non-Defendant currency buyers and decreasing the prices received
by non-Defendant currency sellers, thereby overcharging FX customers.  Thus, Defendants'
actions deprived FX customers of a competitive marketplace and exposed them to artificial
pricing and volatility.

182.    The injuries suffered by Plaintiffs and members of the Classes are directly
traceable to Defendants' anticompetitive conduct alleged herein.  On any day that one or more of
the Fixes were manipulated by Defendants, all members of the Direct/Exchange-Only Settlement
Classes who purchased FX Instruments from Defendants or FX Exchange-Traded Instruments
from a U.S. exchange paid supracompetitive prices for those instruments.  When Plaintiffs and
members of the Classes held an FX Instrument, or an interest in an FX Investment Vehicle or FX
Account that held an FX Instrument, and the FX Instrument was purchased directly from a
member of the Direct/Exchange-Only Settlement Classes (and thus indirectly purchased from
one or more Defendants or co-conspirators), the overcharges incurred as a result of Defendants'
FX manipulation was directly passed on to Plaintiffs and members of the Classes.

183.     Many Plaintiffs and members of the Classes purchased FX Instruments indirectly from Defendants through their ownership of interests in FX Investment Vehicles for which a member of the Direct/Exchange-Only Settlement Classes entered into FX Instruments with a Defendant or U.S. exchange.  The value of and income received from an FX Investment Vehicle is directly dependent on the value and performance of assets held by the FX Investment Vehicle, including foreign currencies.  Thus, when an FX Investment Vehicle entered into an FX Instrument directly with a Defendant, co-conspirator, or U.S. exchange, and the FX Instrument was priced at anticompetitive rates due to Defendants' conspiracy, any party that owned an interest in the FX Investment Vehicle was harmed by Defendants' illegal conduct.  As a direct result of Defendants' collusion, the Plaintiffs and members of the Classes who purchased FX Instruments indirectly from Defendants through their ownership of interests in FX Investment Vehicles were injured in the form of overcharges on those FX Instruments that were ultimately absorbed by those Plaintiffs and the Class members.  Thus, the injuries to Plaintiffs and the members of the Classes are proximate to the anticompetitive conduct alleged herein and inextricably intertwined with it.

184.     Similarly, Plaintiffs and members of the Classes who purchased FX Instruments indirectly from Defendants through investment brokers, FX Accounts, and other non-Defendant intermediaries were directly and proximately injured by Defendants' anticompetitive conduct. When a consumer purchases an FX Instrument through a broker or other third party, any anticompetitive overcharge incurred in the third party's purchase is passed on directly to the customer.  Therefore, when Plaintiffs and members of the Classes purchased FX Instruments indirectly from Defendants through non-Defendant intermediaries, and the intermediaries

transacted directly with one or more Defendants, those Plaintiffs and Class members were injured by Defendants' anticompetitive conduct in the form of overcharge on FX Instruments.

185.    Absent collusion, each individual Defendant would have had an independent incentive to quote tighter bid-ask spreads in order to stay competitive with other dealers in the FX market.  Thus, no single Defendant would have fixed its own bid-ask spread but for a conspiracy among multiple Defendants.

186.    Absent collusion, an individual Defendant's attempt to manipulate FX rates would have little to no effect on the FX market.  Thus, no single Defendant could have consistently manipulated FX rates but for the conspiracy.

187.    Furthermore, Plaintiffs are efficient enforcers of the antitrust laws here.  The efficient enforcer inquiry turns on: (1) whether the antitrust conduct at bar directly caused the instant injuries; (2) whether there is an identifiable class of other persons whose self-interests would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury.  Thus, built into the analysis is an assessment of the so-called chain of causation between the violation and the injury.  Those conditions are met here.  Specifically, as detailed above, Defendants' market-rigging directly caused Plaintiffs and the Class members economic harm in their FX market transactions via FX Instruments and interests in FX Investment Vehicles and FX Accounts owned by Plaintiffs and the Classes.  There is no like, identifiable class of other persons whose self-interests normally would lead them to supplant Plaintiffs here and sue for these particular state law-based antitrust and consumer protection violations; the complained-of injuries here are not speculative; and there is no risk of duplicative damage awards, especially

63

given the already-concrete relationship between the total losses to competition occasioned by the FX market conspiracy, preexisting direct purchaser litigation (and the preliminarily approved Direct/Exchange-Only Class Settlements), and the claims for relief presented in this indirect purchaser Complaint.

## **FRAUDULENT CONCEALMENT**

188.     Throughout the Class Period, Defendants knowingly, fraudulently, and deliberately concealed their conspiracy to fix FX prices from Plaintiffs and members of the Classes.

189.     Concealment of the secret communications between Defendants was an essential element of the conspiracy to manipulate FX prices.  Defendants communicated through non-public chat rooms, phone calls, instant messages, text messages, and email.

190.     On June 11, 2013, Bloomberg Business published an article reporting that several Defendants had colluded to manipulate the WM/Reuters Fixes by collectively front-running customer orders.  To Plaintiffs' knowledge, this was the first public report concerning Defendants' price manipulation in the FX market.  Subsequent news articles and government investigation reports further revealed the involvement of all Defendants and the nature of Defendants' widespread conspiracy.

191.     Prior to the Bloomberg article, information regarding Defendants' conspiracy was not reasonably available to Plaintiffs or members of the Classes.

192.     Defendants only allowed high-level traders to participate in these secret communications regarding the conspiracy.  In efforts to avoid detection, these traders used code words, phone calls, encrypted messages, and self-destructing message platforms.

193.     In one example of a trader attempting to conceal FX manipulation, a JPMorgan FX trader warned a Barclays trader that they should not discuss their plan to manipulate the

USD/South African Rand rate via instant message.  In a November 4, 2010 chat transcript that was later uncovered by the New York Department of Financial Services, the Barclays trader stated, "if you win this we should coordinate you can show a real low one and will still mark it little lower haha."  The JPMorgan trader replied that they "prolly shudnt put this on perma chat," and Barclays trader responded "if this is the chat that puts me over the edge than oh well. much worse out there."

194.    As a result of Defendants' efforts to conceal their conspiracy, Defendants successfully prevented Plaintiffs from being able to learn of the facts needed to bring suit against Defendants for conspiring to manipulate FX prices until at least June 11, 2013.

195.    Because Defendants fraudulently concealed their conspiracy in deliberate efforts to prevent Plaintiffs and members of the Classes from commencing suit, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1**
**(On Behalf of All Plaintiffs against All Defendants)**

196.    Plaintiffs incorporate each allegation above as if fully set forth herein.

197.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

198.    The acts done by each of Defendant as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

199.    At least as early as 2007, and continuing until at least 2013, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for FX Instruments, thereby creating anticompetitive effects.

200.    The anticompetitive acts were intentionally directed at the United States market for FX Instruments and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for FX Instruments throughout the United States.

201.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for FX Instruments.

202.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Classes have been harmed in the form of overcharges on FX Instruments.

203.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

204.    Defendants' conspiracy had the following effects, among others:

a.      Price competition in the market for FX Instruments was restrained, suppressed, and/or eliminated in the United States;

b.      Prices for FX Instruments sold by Defendants and their co-conspirators were fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

66

c.      Plaintiffs and members of the Nationwide Classes who purchased FX Instruments indirectly from Defendants and their co-conspirators were deprived of the benefits of free and open competition.

205.    Plaintiffs and members of the Nationwide Classes have been injured and will continue to be injured in their business and property by paying more for FX Instruments purchased indirectly from Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.

206.    The alleged contract, combination, or conspiracy is a *per se* violation of the Sherman Act.

207.    Plaintiffs and members of the Nationwide Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violations of the Cartwright Act,**
**California Business and Professions Code § 16720, *et seq.***
**(On Behalf of California Plaintiffs against All Defendants)**

208.    Plaintiffs incorporate each allegation above as if fully set forth herein.

209.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, § 16700, *et seq.* (the "Cartwright Act") The California Plaintiffs, on behalf of the proposed statewide California Classes of indirect FX purchasers, allege as follows:

a.      Beginning at least as early as December 1, 2007, and continuing throughout the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce, as described above, in violation of California Business and Professions Code § 16720.  Each Defendant has acted in violation of § 16720 to fix, raise, and maintain artificial prices for FX Instruments.

b.      For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above.

c.      Defendants' unlawful trust consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.  Defendants entered into and participated in the unlawful trust for purposes of, *inter alia*, (i) creating and carrying out restraints in the FX market; (ii) artificially manipulating the prices of FX Instruments, including FX Instruments sold in California and to California residents; (iii) preventing competition and competitive prices in the FX market; (iv) establishing and settling prices for FX Instruments between Defendants, so as to preclude unrestrained competition among themselves and all purchasers and owners of FX Instruments; and (v) creating and carrying out agreements to pool and combine Defendants' financial interests connected with their sales and purchases of FX Instruments.

d.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (i) price competition in the sale of FX Instruments has been restrained and suppressed in the State of California and throughout the United States; (ii) prices for FX Instruments sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificial levels in the State of California and throughout the United States; and (iii) those who purchased FX Instruments directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

e.      As a direct and proximate result of Defendants' unlawful conduct, the California Plaintiffs and members of the California Classes have been injured in their business and property in that they incurred overcharges on FX Instruments, interests in FX Investment

Vehicles, and interests in FX Accounts that they otherwise would have incurred in the absence of

Defendants' unlawful conduct.  As a result of Defendants' violations of the Cartwright Act, the

California Plaintiffs and members of the California Classes seek treble damages and their cost of

suit, including a reasonable attorney's fee, pursuant to § 16750(a) of the California Business and

Professions Code.

**THIRD CLAIM FOR RELIEF**
**Violations of California's Unfair Competition Law,**
**California Business and Professions Code § 17200, *et seq.***
**(On Behalf of California Plaintiffs against All Defendants)**

210.    Plaintiffs incorporate each allegation above as if fully set forth herein.

211.    Defendants have engaged in unfair competition or unfair, unconscionable,

deceptive, or fraudulent acts or practices in violation of California Business and Professions Code

§ 17200, *et seq.* (California's Unfair Competition Law).  The California Plaintiffs, on behalf of the

proposed statewide California Classes of indirect FX purchasers, allege as follows:

a.    Beginning at least as early as December 1, 2007, and continuing

throughout the Class Period, Defendants committed acts of unfair competition, as defined by §

17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and

practices specified above.  Each of the Defendants has acted in violation of § 17200 to fix, raise,

and maintain artificial prices for FX Instruments.

b.    Defendants' conduct as alleged herein violated § 17200, *et seq.* of the

California Business and Professions Code.  The acts, omissions, misrepresentations, practices,

and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and

continuing course of conduct of unfair competition by means of unfair, unlawful, and/or

fraudulent business acts or practices within the meaning of § 17200, *et seq.*, including, but not

limited to, the following: (i) violations of Section 1 of the Sherman Act, as set forth above; and (ii) violations of the Cartwright Act, as set forth above.

c.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 1 of the Sherman Act and the Cartwright Act, and whether or not concerted or independent acts, were otherwise unfair, unconscionable, unlawful, or fraudulent.

d.    Defendants' acts and practices were unfair to indirect purchasers of FX Instruments in the State of California within the meaning of § 17200 of the California Business and Professions Code.

e.    Defendants' acts and practices were fraudulent or deceptive within the meaning of § 17200 of the California Business and Professions Code.

f.    The California Plaintiffs and members of the California Classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

g.    The unlawful and unfair business practices of Defendants caused the California Plaintiffs and the members of the California Classes to incur overcharges on FX Instruments, interests in FX Investment Vehicles, and interests in FX Accounts.  The California Plaintiffs and the members of the California Classes suffered injury in fact in the form of lost money or property as a result of such unfair competition.

h.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  The California Plaintiffs and the members of the California Classes are accordingly

entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Donnelly Act,**
**New York General Business Laws § 340, *et seq.***
**(On Behalf of New York Plaintiffs against All Defendants)**

212.    Plaintiffs incorporate each allegation above as if fully set forth herein.

213.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws § 340, *et seq.* (the "Donnelly Act").  The New York Plaintiff, on behalf of the proposed statewide New York Classes of indirect FX purchasers, alleges as follows:

a.    Beginning at least as early as December 1, 2007, and continuing throughout the Class Period, Defendants and their co-conspirators entered into and engaged in an agreement, arrangement, or combination, in violation of New York General Business Laws § 340, *et seq.*, by engaging in the acts and practices detailed above.  Each Defendant has acted in violation of § 340 to restrain competition and fix, raise, and maintain artificial prices for FX Instruments.

b.    Defendants' and their co-conspirators' agreement, arrangement, or combination had the following effects: (i) FX Instrument price competition was restrained, suppressed, and eliminated throughout New York; (ii) FX Instrument prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (iii) Plaintiffs and members of the New York Classes were deprived of free and open competition; and (iv)

71

Plaintiffs and members of the New York Classes were overcharged for FX Instruments that they indirectly purchased from Defendants and Defendants' co-conspirators.

    c.  Throughout the Class Period, Defendants' anticompetitive conduct alleged herein substantially affected intrastate New York commerce.  The New York Plaintiff and all members of the proposed New York Classes were domiciled in New York during the Class Period and/or purchased FX Instruments in New York indirectly with one or more Defendants during the Class Period.  Many Defendants are headquartered in New York City and/or maintain their principal places of business in New York, and Defendants all conduct significant business in New York, including business relating to FX trading.  For example, Defendants Merrill Lynch, Pierce, Fenner & Smith Inc.; Barclays Capital Inc.; BNP Paribas North America, Inc.; BNP Paribas Securities Corp.; BNP Paribas Prime Brokerage, Inc.; Citigroup Inc.; Citibank, N.A.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; The Goldman Sachs Group, Inc.; Goldman, Sachs & Co; HSBC North America Holdings, Inc.; HSBC Bank USA, N.A.; HSBC Securities (USA) Inc.; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; Morgan Stanley; Morgan Stanley & Co., LLC; and RBC Capital Markets LLC; all have their principal places of business and/or headquarters in New York, New York.  Defendants Bank of America Corporation; The Bank of Tokyo Mitsubishi UFJ Ltd.; Société Générale S.A.; Standard Chartered Bank; UBS Securities LLC; Barclays Bank PLC; Credit Suisse AG; Deutsche Bank AG; and Royal Bank of Scotland Group PLC all have major New York offices and conduct a substantial portion of their FX trading in New York.

    d.  Defendants' agreement, arrangement, or combination caused the New York Plaintiff and the members of the New York Classes to incur anticompetitive overcharges on FX Instruments, interests in FX Investment Vehicles, and interests in FX Accounts.  The New

York Plaintiff and the members of the New York Classes thereby suffered injury in fact in the form of lost money or property.

          e.       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the Donnelly Act, New York General Business Laws § 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, the New York Plaintiff and members of the New York Classes seek treble damages, costs of suit (up to $10,000), and reasonable attorneys' fees.

## REQUESTS FOR RELIEF

Plaintiffs respectfully request the following relief:

A.      That the Court determine that the claims alleged herein are suitable for class treatment and certify the proposed Classes pursuant to Federal Rule of Civil Procedure 23;

B.      That the Court appoint Plaintiffs as the representatives of the Classes;

C.      That Plaintiffs' counsel be appointed as counsel for the Classes;

D.      That the Court award Plaintiffs and the State Classes damages in amounts according to proof against Defendants for Defendants' violations of the state antitrust laws, trebled;

E.      That the Court award Plaintiffs and the California Classes damages in an amount according to proof against Defendants for Defendants' violations of California state consumer protection law;

F.      That Defendants be enjoined from engaging in further unlawful conduct;

G.      That Plaintiffs and the Classes be awarded their costs of suit, including reasonable attorneys' fees and expert fees; and

H.      That Plaintiffs and the Classes be awarded pre- and post-judgment interest on all sums awarded, and other relief as the Court deems necessary and justified.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury of all claims alleged herein so triable.


Dated: September 26, 2016          Respectfully submitted,

                    */s/ Merrill G. Davidoff*
                    Merrill G. Davidoff
                    Todd S. Collins
                    Michael Dell'Angelo
                    Joshua T. Ripley
                    **BERGER & MONTAGUE, P.C.**
                    1622 Locust Street
                    Philadelphia, PA 19103
                    Tel: (215) 875-3000
                    Fax: (215) 875-4604
                    mdavidoff@bm.net
                    tcollins@bm.net
                    mdellangelo@bm.net
                    jripley@bm.net

                    Garrett W. Wotkyns
                    **SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
                    8501 North Scottsdale Road, Suite 270
                    Scottsdale, AZ 85253
                    Tel: (480) 428-0142
                    Fax: (866) 505-8036
                    gwotkyns@schneiderwallace.com

                    Joseph C. Peiffer
                    **PEIFFER ROSCA WOLF ABDULLAH CARR & KANE LLP**
                    201 St. Charles Ave. Suite 4610
                    New Orleans, LA 70170
                    Tel: (504) 523-2434
                    Fax: (504) 523-2464
                    jpeiffer@prwlegal.com

74

R. Bryant McCulley
Stuart McCluer
**MCCULLEY MCCLUER PLLC**
1022 Carolina Boulevard, Suite 300
Charleston, SC 29451
Tel: (855) 467-0451
Fax: (662) 368-1506
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*